Case 1:12-cv-11' '-RWZ Document 1 Filed 08/31/12 'age 1 of 43

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **GREGORY THORPE**<br><br>**-and-**<br><br>**BLAIR HAMRICK**<br><br>*Plaintiffs,*<br>v.<br><br>**KEITH F. CROSS,**<br>**and**<br>**JOSEPH F. BENNETT,**<br>**and**<br>**CROSS & BENNETT L.L.C.**<br><br>*Defendants.* | **Civil Action No. __________** |

**COMPLAINT**

Plaintiffs Gregory Thorpe ("Thorpe") and Blair Hamrick ("Hamrick") (collectively "Plaintiffs") bring this Complaint against Defendants Keith F. Cross ("Cross"), Joseph F. Bennett ("Bennett"), and Cross & Bennett L.L.C. ("Cross & Bennett") and in support thereof aver as follows:

**INTRODUCTION**

1. This case involves a legal representation that was plagued by an egregious pattern of gross malpractice and incompetence followed by dishonesty, cover-ups and conflicts of interests in a complex *qui tam* case against a large pharmaceuticals company. Other lawyers, including lawyers for the Government and other relators, ultimately obtained a favorable result from which the plaintiffs will benefit. Because of the defendants' malpractice and misconduct, however, the plaintiffs suffered substantial losses equal to at least half the value of the case.

Case 1:12-cv-11[illegible]-RWZ Document 1 Filed 08/31/12 Page 2 of 43

Plaintiffs discharged the defendants as their counsel in 2009. But for the defendants' dishonesty and cover-ups, the defendants would have been discharged long before that.

2. The *qui tam* case arose from a nationwide campaign of off-label marketing and kickbacks by one of the world's largest pharmaceutical companies, GlaxoSmithKline LLC ("GSK"), involving no less than thirteen drugs, several of which achieved blockbuster status.

3. Plaintiff Thorpe, who went to Cross & Bennett for employment advice, asked Cross if he would evaluate a *qui tam* lawsuit under the False Claims Act. Cross told Thorpe that qui tam law was "complicated" and that Thorpe shouldn't take his case to a "rookie." After much stalling, Cross promised to handle the case on a contingency fee basis.

4. Cross originally filed the FCA complaint in the District of Colorado. His handling of the case before and after filing the original complaint was characterized by delay, negligence and incompetence and was tainted by conflicts of interest with his clients.

5. As a result of Cross's malpractice described hereinafter, for which Bennett and Cross & Bennett are equally liable, Plaintiffs seek a judgment against the defendants for at least 50% of the Relators' share which the defendants cost the plaintiffs through their gross negligence and incompetence.

6. Plaintiffs ultimately discharged Cross, Bennett and Cross & Bennett on October 21, 2009.

7. Cross, Bennett and Cross & Bennett filed a notice of attorney's lien in the District of Colorado on or about November 12, 2009, claiming 40% of Plaintiffs' recovery in the FCA Case.

8. The lawsuit was later transferred to the United States District Court for the District of Massachusetts at *United States ex rel Greg Thorpe et al. v. GlaxoSmithKline PLC, et al.*, C.A. No. 11-10398-NG-RWZ (the "FCA Case"), where it remains pending.

9. Cross re-filed his notice of attorney's lien in the District of Massachusetts on or about July 25, 2012, again claiming 40% of Plaintiffs' recovery in the FCA Case.

10. In addition to a judgment for money damages, therefore, Plaintiffs seek a declaratory judgment that Cross, Bennett and Cross & Bennett have forfeited all rights to compensation under the notice of attorney's lien, because of gross malpractice, incompetence and professional misconduct.

11. In the alternative, and without admitting any liability, Plaintiffs seek a declaratory judgment that any compensation due Cross, Bennett and Cross & Bennett must be limited to the fair value of the reasonable hours actually spent by Cross in connection with the FCA Case, subject to recoupment by Plaintiffs as a result of Cross's gross malpractice and subject to reduction for his serious ethical breaches.

**THE PARTIES**

12. Plaintiff Thorpe is an Arkansas resident residing at 258 Arrowleaf Lane, Mountain Home, AR 72653.

13. Plaintiff Hamrick is a Florida resident residing at 4509 Watrous Avenue, Tampa, FL 33629.

14. Defendant Cross is a Colorado resident having a business address of 108 E. St. Vrain St., Suite 20, Colorado Springs, CO 80903. He is also an attorney licensed to practice law in the State of Colorado and is a member or owner of Cross & Bennett. As such, he is subject to the Colorado Rules of Professional Conduct ("CRPC").

Case 1:12-cv-11' -RWZ Document 1 Filed 08/31/12 'age 4 of 43

15. Defendant Bennett is a Colorado resident having a business address of 108 E. St. Vrain St., Suite 20, Colorado Springs, CO 80903. He is also an attorney licensed to practice law in the State of Colorado and is a member or owner of Cross & Bennett. Bennett entered his appearance in the FCA case. As such, he is liable for the malpractice and misconduct as described herein.

16. Defendant Cross & Bennett is a Colorado limited liability corporation located at 108 E. St. Vrain St., Suite 20, Colorado Springs, CO 80903. The corporation is liable for the malpractice of Cross and Bennett as described herein.

**JURISDICTION AND VENUE**

17. This case is related to the FCA Case at C.A. No. 11-10398-NG-RWZ in which Cross filed his notice of attorney's lien.

18. This Court has jurisdiction over the matters set forth in this Complaint pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19. Venue is properly laid in the District of Massachusetts pursuant to 28 U.S.C. § 1391(a) because Cross rendered legal services in Massachusetts in cooperation with the Assistant United States Attorney in Massachusetts who led the investigation into GlaxoSmithKline's misconduct. The settlement and the settlement funds from which the relators' shares will be paid are subject to the jurisdiction of the District of Massachusetts in the FCA Case. And the notice of lien filed by Cross in the FCA Case, which is the subject of this suit, is now before the District of Massachusetts.

20. The action for declaratory relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202. An actual, immediate and justiciable controversy exists between the parties with regard to

Cross's right to enforce his attorney's lien against Plaintiffs' relators' share and his attempt to collect 40% of Plaintiffs' recovery in the FCA Case.

**BACKGROUND**

**The First-to-File Rule under the False Claims Act**

21. The False Claims Act ("FCA") provides that citizens, officially called "relators" and often called whistleblowers, may bring suit against companies or individuals who have presented, or caused to be presented, false claims for payment to the government. 31 U.S.C. § 3729 *et seq.*

22. In addition to the federal FCA, a number of states also have false claims statutes. *E.g.,* the California False Claims Act, (Cal. Gov't Code §§ 12650-12655); the Delaware False Claims and Reporting Act (6 Del. C. § 1201 et seq.); the Florida False Claims Act (Fla. Stat. § 68.081 *et seq.*); the Hawaii False Claims Act (Haw. Rev. Stat. § 661-21 and Haw. Rev. Stat. § 378-61, et seq.); the Illinois Whistleblower and Reward Protection Act (740 Ill. Comp. Stat. § 175/1 *et seq.*); the Massachusetts False Claims Act (Mass. Gen. Laws Ann. 12 § 5A *et seq.*); the Michigan Medicaid False Claims Act (Mich. Comp. Laws § 400.601- 400.613); the Nevada False Claims Act (Nev. Rev. Stat. § 357.010 *et seq.*); the Tennessee Medicaid False Claims Act (Tenn. Code Ann.§ 71-5-181 *et seq.*); the Texas Medicaid Fraud Prevention Law(Tex. Hum. Res. Code §36.002 *et seq.);* the Virginia Fraud Against Taxpayers Act (Va. Code Ann. § 8.01-216.1 *et seq.*); and the District of Columbia False Claims Act, (D.C. Code §2-308.03, *et seq.*).

23. The federal and state FCA statutes provide that if there is a recovery at the conclusion of a case, the relator is entitled to a percentage share of that recovery. The percentage

Case 1:12-cv-11f -RWZ Document 1 Filed 08/31/12 age 6 of 43

ranges between 15 and 25% in cases where the United States intervenes, as it did in Plaintiffs' FCA Case.

24. Absent some agreement to the contrary, only the first-filed relator is entitled to a relator's share. The FCA provides that "when a person brings an action under [the FCA], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).

25. The first to file rule only protects the claims that the relator actually asserts. Where a subsequently filed complaint pleads facts and claims distinct from those pled in the first filed complaint, the relator who filed the second complaint will be considered the first-to-file with respect to those facts and claims. *See United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 32 (1st Cir. 2009).

26. As the FCA sounds in fraud, courts have held that relators' complaints must meet the requirements of Federal Rule of Civil Procedure 9(b).

27. If the first filed complaint fails to adequately allege a cause of action under the FCA and Federal Rule of Civil Procedure 9(b), a subsequent relator may challenge the first relator's right to the relator's share.

**Retaliation Claims Under The False Claims Act**

28. The FCA also provides a remedy for relators who are terminated for reporting false claims. 31 U.S.C. § 3730(h).

29. When a relator is terminated for reporting false claims, the relator's personal claim under § 3730(h) is typically asserted as part of the FCA case and remains under seal until the seal is lifted.

## ALLEGATIONS

### Thorpe Retains Cross to Represent Him in an Employment Dispute

30. In the fall of 2001, Plaintiff Thorpe was a senior sales representative working at GSK.

31. In the course of his employment by GSK, Thorpe discovered that GSK was engaged in illegal marketing practices with respect to a number of its drugs. Thorpe reported these practices within GSK first to his boss, then to the appropriate compliance and in-house legal personnel, and, finally, to the company's senior management. Despite the legitimacy of Thorpe's reports, GSK continued its unlawful practices and began to retaliate against Thorpe for blowing the whistle.

32. On or about September 18, 2001, Thorpe retained Cross to advise and represent him in connection with employment issues arising from GSK's retaliation.

33. Cross continued to represent Thorpe in connection with his employment dispute with GSK until his representation of Thorpe was terminated in 2009.

34. Cross charged Thorpe $175.00 per hour for representation concerning employment matters. On information and belief, $175.00 was Cross's normal and customary hourly rate.

### Cross Failed to Inform Thorpe in a Timely Fashion Whether or Not He Would Take Thorpe's False Claims Act Case

35. From the beginning of his representation by Cross, Thorpe discussed with Cross the possibility of bringing a *qui tam* lawsuit against GSK.

36. Cross represented to Thorpe that he was experienced in preparing and litigating FCA claims, and expressed interest in evaluating Thorpe's case against GSK.

4657930

Case 1:12-cv-11r -RWZ Document 1 Filed 08/31/12 age 8 of 43

37. The website for Cross's law firm, which was copyrighted in 1999, stated in pertinent part:

> Welcome to the web site of Cross, Bennett & Hessel, L.L.C., a law firm providing litigation services throughout Colorado. The firm is rated A-V in Martindale-Hubbell, the highest ethical and competence rating.
> Our firm has wide-ranging expertise in the areas of Personal Injury, Medical Malpractice, Insurance Law, Employment Law, Worker's Compensation, Civil Rights & Discrimination, Attorney Malpractice, Government Contractor Fraud and *Qui Tam/Whistleblower cases*.
>
> * * * *
>
> **Firm Overview**
>
> Cross, Bennett & Hessel, L.L.C., located in Colorado Springs, Colorado, is a full-service civil litigation law firm providing legal representation to persons and corporations throughout Colorado, including the front range, into the high country and on the western slope. The firm provides advice and representation in the areas of personal injury, medical malpractice, wrongful death, employment and labor law, civil rights, discrimination, wills and trusts, workers compensation and insurance law. *We also handle "whistleblower" lawsuits involving fraudulent claims for government funds and illegal activities in the workplace.*
>
> * * * *
>
> **Government Contractor Fraud and Qui Tam/Whistleblower cases**
>
> Federal law prohibits contractors from defrauding the government. While everyone knows that, few know that federal law also provides a remedy whereby persons who are aware of fraudulent conduct can initiate litigation against the party responsible and share in the government's recovery. In addition, the law provides remedies for employees whose investigation and reporting of fraudulent claims results in the termination of their employment. *At CBH, we can handle your "whistleblower" lawsuit, whether it be against a defense contractor, Medicare or Medicaid provider, hospital or any other person or organization.*

(Emphasis supplied.)

Case 1:12-cv-11( -RWZ Document 1 Filed 08/31/12 age 9 of 43

38. Despite his purported experience in handling whistleblower cases, Cross took from September 2001 to August 2002, a period of eleven months, to decide whether he would represent Thorpe in an FCA action. Given the importance of first filing, Cross's delay was unreasonable and incompetent under CRPC 1.1 regarding "Competence," the governing rules of professional conduct in this case. Although ethical violations are not necessarily malpractice per se, they are indicative of malpractice.

39. From September 2001 to August 2002, Thorpe provided Cross with numerous documents supporting an FCA claim against GSK and discussed bringing a FCA lawsuit against GSK with Cross on numerous occasions, both orally and in writing.

40. On October 9, 2001, Thorpe provided Cross with a handwritten letter discussing GSK's off-label promotion of drugs and kickbacks to physicians.

41. In e-mails dated April 9, 23, 30 and May 17, 2002, Thorpe provided, or offered to provide, Cross with information substantiating his allegations that GSK was engaged in illegal activity. In response to each e-mail, Cross indicated his interest in receiving the information.

42. As late as May 18, 2002, in response to Mr. Thorpe's May 17th e-mail, Cross stated, "Greg I have been swamped so have not had time to review the *qui tam* in detail. I will do so. If I do not handle it for you I will give you a recommendation. Believe me, this is a complicated area of the law and not only should you not try to take it by yourself but there really are very few attorneys who have handled *qui tam*s and I don't recommend that you go to a rookie." By this time Cross had been aware of Thorpe's desire to retain counsel to bring an FCA case against GSK for approximately eight months.

43. It was not until August 22, 2002 that Cross and Thorpe finally entered into a contingent fee agreement for the prosecution of FCA claims against GSK.

Case 1:12-cv-11€ RWZ Document 1 Filed 08/31/12 age 10 of 43

44. Even after Cross finally agreed to represent Thorpe in the FCA case, he took another four months, from August 22, 2002 until January 2, 2003, to file a sparse 12 page complaint (the "Original Complaint"). Given the importance of first filing, this additional delay was unreasonable and incompetent under CRPC 1.1.

45. Furthermore, in failing to respond to Mr. Thorpe's requests for representation in a timely manner and failing to evaluate the FCA case promptly, Cross violated CRPC 1.3 regarding "Diligence" and Rule 1.4(a)(4) regarding "Communication." These rules provide, respectively, that a lawyer must act with reasonable diligence and promptness in representing a client, and that a lawyer must promptly comply with reasonable requests for information. Cross's lack of diligence and failure to communicate had the potential to prejudice Thorpe's claim in its entirety by delaying the filing of an FCA complaint on his behalf. Cross knew, or should have known, the importance of first-filing in a *qui tam* FCA case and should have provided Thorpe with referrals, if he felt that he could not evaluate or accept the case at the time it was offered to him.

**Cross Failed To Give Thorpe Timely Advice**
**Concerning the Relationship of His Employment Dispute and His FCA Case**

46. On March 11, 2002, GSK informed Thorpe by telephone that GSK would not act on Thorpe's allegations of illegal conduct but would allow Thorpe to return to work.

47. On March 18, 2002, GSK informed Thorpe that he had the option of either returning to work, or accepting a "standard displacement package."

48. On March 21, 2002 Cross sent a letter on Thorpe's behalf to GSK's Regional Director of Human Resources, Carrie Rubright, informing her that Mr. Thorpe would not return to work at GSK.

Case 1:12-cv-116 RWZ Document 1 Filed 08/31/12 age 11 of 43

49. There was a period of time before March 2002, when Thorpe would have considered returning to work at GSK if Cross had agreed to handle Thorpe's FCA Case.

50. However, because Cross had not agreed to take the FCA Case, Thorpe felt he had no choice but to take a severance package from GSK.

51. If Cross had evaluated Thorpe's *qui tam* action before March 2002, as he should have, he could have advised Thorpe, at the very least, what additional information he should gather before leaving GSK.

52. If Cross had evaluated Thorpe's *qui tam* action before March 2002, as he should have, he could have advised Thorpe that if Thorpe accepted reinstatement as an active employee of GSK, he would be able to continue to observe and report about continuing FCA violations to the United States.

53. Cross was well aware how important it is for whistleblowers to retain their employment for as long as possible. After he decided to take the case, Cross advised Thorpe to add Hamrick as a co-relator in part because of the fact that Hamrick was still an employee of GSK. Later, when Hamrick was on the verge of being terminated from GSK, Cross wrote to Thorpe that "Blair needs to do whatever he can to keep his job with GSK both for his personal purposes as well as our case."

54. Had Cross accepted the FCA Case before March of 2002 and timely explained the ramifications of leaving GSK, Thorpe may have elected to remain an employee and gather additional evidence against GSK for as long as possible.

55. Cross's failure to timely evaluate Thorpe's FCA Case meant that Thorpe had to make a decision about his employment with GSK without knowing if Cross would handle his FCA Case. It also led to Cross's failure to advise Thorpe regarding the potential importance of

Case 1:12-cv-11( RWZ Document 1 Filed 08/31/12 age 12 of 43

continuing employment in a *qui tam* case. Cross's conduct was negligent and incompetent. It was also a violation of CRPC Rules concerning "Communication" and "Allocation of Authority." Rule 1.4(b) regarding "Communication" states that "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Thorpe's decision to leave GSK was not "informed" within the meaning of CRPC Rules 1.0(e). As a result, Thorpe's ability to exercise control over, and to make relevant and important decisions concerning, his case was impaired, contrary to CRPC Rule 1.2(a) concerning "Allocation of Authority."

**Cross Erroneously Advises Thorpe**
**Concerning His Severance Agreement with GSK**

56. The negotiations between Cross and GSK with respect to Thorpe's severance package drew to a close in August 2002.

57. On August 8, 2002, with the terms of Thorpe's severance agreement finalized, Thorpe asked for Cross's advice as to whether he should sign the agreement, which also purported to release any claims he might otherwise have. According to Cross's own notes, he responded as follows to Thorpe's request for legal advice:

> If it were me - because I'm conservative - I would take the money and sign the release - that means [you] will not be able to sue individually, but [you] should still have an FCA claim if the government intervenes, not sure if the government declines.

Upon receipt of this "advice" from Cross, Thorpe signed the severance agreement with GSK.

58. Before rendering the foregoing advice, Cross did not analyze Thorpe's potential for recovery on a wrongful discharge claim or on a retaliatory discharge claim under §3730(h) of

Case 1:12-cv-11( -RWZ Document 1 Filed 08/31/12 age 13 of 43

the FCA. Cross also did not clearly explain to Thorpe the difference between a wrongful discharge claim and a §3730(h) claim.

59. Cross's failure to advise Thorpe regarding his employment litigation claims was not only an act of negligence but also a violation of CRPC Rules 1.1, 1.2(a) and 1.4 concerning "Competence," "Allocation of Authority," and "Communication."

60. Thorpe sent the signed severance agreement to GSK on August 8, 2002.

61. Cross finally signed a contingent fee agreement with Thorpe on August 22, 2002.

**Cross Erroneously Advises Thorpe That His Severance Agreement May Impair His False Claims Act Case**

62. Cross advised Thorpe that signing the severance agreement with GSK could disqualify him from serving as a relator in a *qui tam* FCA claim against GSK in the event that the government should decline to intervene in the case. This advice was erroneous. It was consistent, however, with Cross's continuing pattern of incompetence and negligence.

63. Based on *United States of America ex rel. Bahrani v. Conagra, Inc.*, 183 F. Supp.2d 1272 (D. Colorado 2002), which he downloaded on August 25, 2002, Cross knew or should have known that Thorpe had no ability to release a claim belonging to the government, regardless of the government's decision to intervene or not to intervene in the case. Cross further knew or should have known that such a release would not disqualify Thorpe from serving as a relator under the facts of this case.

64. On information and belief, Cross failed to fully analyze the legal effect of signing the severance agreement on Thorpe's ability to serve as a relator. Cross's failure was not only an act of negligence, but also a violation of CRPC 1.1 concerning "Competence."

65. Based on his erroneous view that Thorpe could be disqualified from serving as a relator in an FCA case because of the general release he signed, Cross advised Thorpe to recruit

Case 1:12-cv-11( -RWZ Document 1 Filed 08/31/12 age 14 of 43

a current GSK employee who had not signed a severance agreement with GSK to serve as a co-relator so that Thorpe would receive a portion of the relator's share regardless of the effect of Thorpe's release of GSK. Cross's erroneous advice was not only negligent, but in violation of CRPC Rule 1.1 concerning "Competence." Furthermore, Cross's advice was tainted by a conflict of interest in violation of CRPC 1.7(a)(2) concerning "Conflict of Interest," to the extent it was designed to compensate for and cover up Cross's mistake in failing to advise Thorpe to accept reinstatement, which would have avoided any need to sign a severance agreement or to recruit a co-relator. By protecting his interests at the expense of his client, Cross also breached the duty of loyalty he owed Thorpe.

66. Moreover, Cross violated CRPC 1.4(b) in that he did not adequately and accurately explain to Thorpe the legal effect of signing the severance agreement on Thorpe's ability to serve as a relator or the need to recruit a co-relator who had not signed a severance agreement. As a result, Thorpe was not fully informed when he made the decision to add a co-relator, and his ability to exercise control and make decisions concerning the objectives of his case was impaired, in violation of CRPC Rule 1.2(a) concerning "Allocation of Authority."

67. Cross's erroneous advice concerning the effect of the severance agreement caused Thorpe to give up a portion of his relators' fee as the price of adding a co-relator. To the extent that it was not necessary to add a co-relator to protect Thorpe's interests, or only became necessary as a result of Cross's negligence in failing to advise Thorpe to stay with GSK, Cross's malpractice caused Thorpe to surrender a portion of his relator's fee unnecessarily.

**Cross Meets with Blair Hamrick,**
**and Both Thorpe and Hamrick Suffer Harm**

68. Thorpe knew that, like himself, his former co-worker, Hamrick, was troubled by the illegal conduct occurring at GSK.

69. On August 29, 2002, Thorpe sent an e-mail to Cross stating that Hamrick was "Basically screwed by GSK, so he said he will be our 'mole'." Cross responded the same day that "It's good that he can help us."

70. On October 16, 2002 Cross sent an e-mail to Thorpe asking "Are you still in touch with your friend [Blair Hamrick] here? Should I try to set up a meeting with him?"

71. On November 12, 2002, after meeting with Hamrick, Cross e-mailed Thorpe to recommend that Hamrick join his FCA lawsuit as a 50/50 partner:

> Greg I just met with Blair. I also have done some additional research. I think it is possible to have two relators on the same case, if you file as plaintiffs in the same complaint. It would really be the only way to involve Blair. You would have to agree to split the proceeds of the case 50/50; otherwise, I think there could possibly be a conflict of interest. He may have some personal claims against the company that you probably don't have because of the waiver, but at this point, those claims do not seem particularly strong, especially since the company has not chosen to terminate his employment. I think Blair can be of great assistance on this case and I would encourage you to have him join you in it.

72. Cross's advice that "you would have to split the proceeds of the case 50/50" to avoid a conflict of interest was incorrect and incompetent. Cross knew or should have known that there is no prohibition against co-relators agreeing to something other than a 50/50 split of the relator's share.

73. Cross negligently failed to advise his existing client, Thorpe, regarding how Thorpe might negotiate a sharing agreement with Hamrick. He failed to inform Thorpe, for example, that his bargaining position with Hamrick would be stronger after Thorpe had filed an initial *qui tam* complaint. This caused Thorpe to agree to a less favorable split of the relator's share than he otherwise could have negotiated.

Case 1:12-cv-11( -RWZ Document 1 Filed 08/31/12 age 16 of 43

74. Similarly, after having met with Hamrick as a potential client, Cross failed to advise both Thorpe and Hamrick that they should consult separate counsel with respect to the terms of a sharing agreement. By failing to do so, and then advising both Thorpe and Hamrick to split the proceeds 50/50, Cross placed himself in exactly the type of conflict situation he claimed to be trying to avoid, contrary to CRPC 1.7. In so doing, Cross also violated CRPC 1.1 concerning competence, 1.2(a) concerning authority, and 1.4(b) concerning communication.

75. With respect to the sharing agreement, Cross failed to discharge his obligations to both his client and his potential client. He negligently failed to protect either's interests and deprived both of them of the opportunity to negotiate a higher percentage with the assistance of separate counsel.

76. Thorpe and Hamrick followed Cross's advice and entered into a 50-50 sharing agreement with each other.

77. Thorpe and Hamrick followed Cross's advice and entered into a 50-50 sharing agreement with each other.

78. Without realizing they had already suffered significant harm as a result of Cross's malpractice, Thorpe and Hamrick signed a joint Contingent Fee Agreement retaining Cross to pursue a FCA case against GSK on November 27, 2002.

79. The November 27, 2002 contingency fee agreement provided Cross with a 45% contingency fee if there was a recovery. On information and belief, a 45% contingency fee was excessive in violation of CRPC 1.5 concerning "Fees."

80. The contingency fee agreement was reduced to 40% in February 2007. Cross agreed to reduce his fee, if Thorpe and Hamrick would agree to sign a 2.25% sharing agreement with Joseph Piacentile instead of contesting his status as a relator.

**Cross Negligently Fails To Include Certain**
**Claims and Allegations in the Original Complaint**

81. On January 1, 2003, Cross filed the Original Complaint in Thorpe's and Hamrick's FCA lawsuit against GSK.

82. Cross did not include in the Original Complaint all of the claims and theories that Thorpe and Hamrick brought to his attention. Cross failed to include all of the drugs that GSK was marketing off-label, failed to plead that GSK violated the applicable anti-kickback statute, and failed to plead violations of various state false claims acts.

83. Incredibly, Cross failed to share a copy of the Original Complaint with his clients in advance of filing it, in violation of CRPC Rule 1.4(a).

84. Had Cross shared a draft of the Original Complaint prior to filing, as he should have, the clients would have had the opportunity to point out the important evidence and theories Cross had ignored.

85. Prior to the filing of the Original Complaint, Thorpe and Hamrick provided Cross with information regarding the off-label marketing of a number of drugs that Cross failed to include in the Original Complaint, including: (1) Amerge; (2) Paxil; (3) Valtrex; and (4) Wellbutrin for sexual dysfunction.

86. Prior to the filing of the Original Complaint, Hamrick provided Cross with information concerning the off-label marketing of Advair for asthma, as well as chronic bronchitis and emphysema. After the filing of the Original Complaint, on or about March 13, 2008, Hamrick provided Cross with information concerning a training pamphlet and handwritten notes on Advair for various forms of asthma, including mild asthma, as well as a list of attendees for a GSK-sponsored presentation on mild asthma.

87. In addition, Thorpe and Hamrick provided Cross with evidence of conduct constituting illegal kick-backs that Cross failed to plead in the Original Complaint.

88. Although Thorpe and Hamrick provided Cross with substantial evidence that GSK's illegal conduct was occurring nationwide, Cross failed to file claims under any state false claims acts.

89. Cross was grossly negligent in preparing the Original Complaint against GSK. Cross knew from the beginning that Thorpe wanted Cross to represent him in a FCA case against GSK. Cross repeatedly encouraged Thorpe to provide him with relevant information and indicated that he would review it. However, Cross procrastinated and put Thorpe's FCA case off for almost a year. Despite having had Thorpe's materials for the better part of a year and Hamrick's materials for several months, Cross filed a complaint that failed to include all the claims that he should have asserted on their behalf. Cross's conduct was incompetent under CRPC Rule 1.1 and lacking in diligence under CRPC Rule 1.3.

90. The Original Complaint was not of the quality that would be expected of a lawyer having the *qui tam* experience that Cross claimed to have. Either Cross negligently failed to act with the competence he possessed, or he did not possess the competence he claimed. Cross led Thorpe to believe that he was knowledgeable and experienced in *qui tam* litigation; that his prior *qui tam* experience qualified him to prosecute a major case involving the off-label marketing of thirteen drugs by one of the largest pharmaceutical companies in the world; and that he had sufficient time and resources to handle such a case. On information and belief, Cross's representations concerning his qualifications to handle Thorpe's FCA Case violated CRPC 7.1(a)(1) governing "Communications Concerning A Lawyer's Services."

Case 1:12-cv-11( -RWZ Document 1 Filed 08/31/12 age 19 of 43

91. Cross's failure to file all of the claims he should have in the Original Complaint, opened the door under the "first to file" rule that a subsequent complainant could undercut Thorpe and Hamrick's first in time complaint by a later filed complaint that included the missing claims, which is exactly what happened in this case.

92. The "first to file" rule in FCA cases imposes on relators' counsel the duty to be ever diligent in asserting new claims and new theories as soon as they become evident because otherwise they may be lost to a subsequent "first filer" on those claims.

93. In this case, Cross had the opportunity to remedy the mistakes he made in the Original Complaint by promptly filing an amended complaint. Cross failed to do so, even though Thorpe and Hamrick were quick to point out omissions after Cross finally showed them what he had filed. Despite knowing that time was of the essence, and in spite of Plaintiffs' repeated demands that he amend the complaint promptly, Cross failed to amend until April 2005. By that time, another filer had undercut Thorpe and Hamrick's first to file status by alleging the very claims Cross had overlooked.

94. In addition, Cross negligently filed the Original Complaint in the District of Colorado, rather than in the District of Massachusetts, where he knew the United States Attorneys Office was highly experienced in, and committed to, investigating and prosecuting FCA cases against large drug companies.

95. Cross knew or should have known that the venue provision in the FCA permitted him to file the Original Complaint in the District of Massachusetts. As it turned out, the second filer, represented by competent counsel, filed in the District of Massachusetts and thereby effectively co-opted the investigation that had begun in Colorado.

**Cross Fails to Self-Report his Mistakes and Instead**
**Advises Thorpe and Hamrick to Cut a Deal with a Second Filer**

96. On or about July 18, 2003, Cross had a telephone conference with Mike Theis and Edwin Winstead, two Assistant U.S. Attorneys assigned to Plaintiffs' FCA case. During that conference Theis revealed to Cross that relators represented by Philips & Cohen (P&C) had filed an FCA complaint against GSK in Massachusetts on April 7, 2003, a little more than three months after Plaintiffs filed their complaint in the District of Colorado.

97. Under the FCA, subsequent complaints raising the same allegations as the first-filed complaint are subject to summary dismissal.

98. Without even having seen the Phillips & Cohen complaint, Cross immediately advised Thorpe and Hamrick by email dated July 18, 2003 that they were "almost certainly going to have to cut the other relators in and try to make a deal or risk getting cut loose."

99. Cross based his recommendation to "cut the other relators in" on the grounds that the P&C complaint was filed in Massachusetts, which Cross stated would probably handle the investigation and prosecution of the case; that P&C is "one of the foremost qui tam law firms in the country"; that, according to Theis and Winstead, the relators in the P&C case were top level management at GSK which gave the complaint a "nationwide impact" that Thorpe and Hamrick's Original Complaint lacked; and that P&C might engage in "protracted litigation" to get the Plaintiffs' case "thrown out."

100. Cross's statements to Thorpe and Hamrick in the July 18, 2003 e-mail would only be true if his work were incompetent. The statements were an indirect admission that the quality of his work was substandard and that he lacked the experience and the resources to handle the case properly. Cross should have filed the Original Complaint in Massachusetts. He promised to, and should have referred Thorpe and Hamrick to a qualified qui tam law firm. He should

have filed a "nationwide impact" complaint. He should have filed a competent complaint that was not subject to being "thrown out." Furthermore, he should have investigated Phillips & Cohen's complaint and relators before making any recommendation.

101. Cross failed to come clean with his clients and allow them to decide whether to replace him or continue with him at a reduced fee. Instead, Cross allowed his self-interest in retaining the representation to taint his advice to his clients, in violation of CPRC 1.7(a)(2) concerning conflict of interest.

102. According to Cross, the Original Complaint that he prepared lacked "nationwide impact," because "under [Federal Rule of Civil Procedure 9(b) for a case to have nationwide recovery potential, you have to have factual detail for every region in the country -- that means names, dates, places, activities and documents. We just don't have that." This was incorrect and another example of Cross's negligence.

103. Plaintiffs had provided Cross with detailed information regarding conduct that GSK was engaged in throughout the United States and were in a position to provide more with proper guidance from Cross. Thus, any lack of nationwide impact was solely the result of Cross's failure to properly plead the facts in the Original Complaint or to work with his clients so that he could gain additional information and promptly amend.

104. In an e-mail exchange on July 21, 2003, Thorpe wrote that if the roles were reversed, he would expect P&C as first-filer to try and get a second filed complaint by Plaintiffs dismissed. Yet he failed to discuss whether Thorpe and Hamrick, as actual first filers, should move to dismiss the P&C complaint. Instead, Cross focused on the advantages of doing a deal with P&C: "One thing is clear - the Boston US atty's office cannot (and will not) lend its investigation and prosecution team to Colorado, so we would be stuck with what we have here."

105. Cross received a copy of P&C's first amended complaint on July 25, 2003. After reading it, Cross commented to Plaintiffs in an e-mail on July 28, 2003 that "[the P&C complaint is] 96 pages and has significantly more detail that we do, but overall, the 'cause of action' is the same." Cross failed to tell Thorpe and Hamrick that the P&C first amended complaint included state false claims act claims and federal anti-kickback claims that should have been included in Thorpe and Hamrick's Original Complaint. Cross also failed to explain that the P&C relators were first filed on those claims.

106. It was not true that the causes of action in the Original Complaint and the P&C first amended complaint were "the same." In saying so, Cross revealed that either he did not understand the significance of the anti-kickback and state false claims act claims, which would constitute gross incompetence under CRPC Rule 1.1 governing "Competence," or else he was covering up his incompetence in failing to include such claims in the Original Complaint or to add them by way of a prompt amendment of the Original Complaint, which would constitute (a) self-interested conduct under CRPC Rule 1.7(a)(2) concerning conflict of interest, and (b) dishonesty under CRPC Rule 8.4(c) governing misconduct.

107. Thorpe suggested that Cross start negotiations by offering P&C 10% of any relators' share. In response, Cross indicated that P&C deserved a larger share and and suggested that frightening consequences would result if they took too hard a line: "My gut feeling is that if the only case on the table is ours, the government, which is to say, the US Attorney's Office for the District of Colorado, may well not intervene – for sure, they will not do the kind of investigation that the US Atty in Massachusetts will do...."

108. It was misleading for Cross to suggest that plaintiffs' FCA Case could be "the only case on the table," given that the P&C relators were first filed as to the federal anti-kickback

Case 1:12-cv-11[illegible] -RWZ Document 1 Filed 08/31/12 Page 23 of 43

claims and state false claims act claims, and inaccurate to suggest the District of Massachusetts would not continue to investigate the P&C relators' allegations in the absence of a sharing agreement between plaintiffs and the P&C relators.

109. Cross negligently failed to file the Original Complaint in the District of Massachusetts. Had Cross filed in the District of Massachusetts, Thorpe and Hamrick would have had a stronger bargaining position with the P&C relators.

110. In subsequent discussions, Cross continued to push Thorpe and Hamrick to cut a generous deal with P&C, despite their consistent demands that he take a more aggressive position. Cross's failure to follow his clients' instruction in this regard was a violation of CRPC Rule 1.2 concerning "Allocation of Authority."

111. Ultimately, Cross prevailed on Thorpe and Hamrick to give P&C 50% of the overall relator's share in settlement of any dispute between the parties over first-to-file status.

112. Plaintiffs entered into a 50-50 sharing agreement with the P&C relators in January 2004, which listed the drugs the parties had identified in the Original Complaint and P&C first amended complaint.

113. Cross's handling of the sharing agreement with P&C was a clear and serious breach of professional ethics because his advice to clients and his actions on their behalf were tainted by a substantial conflict of interest.

114. Cross had a duty to self-report his mistakes and his conflict of interest to Thorpe and Hamrick. Cross's failure to do so was a violation of CRPC Rules 1.4, 1.7, and 8.4 concerning "Communication," "Conflict of Interest," and "Misconduct," respectively.

115. Cross never disclosed his mistakes and his conflict, because of the likelihood that he would be fired for cause, lose his fee, and be sued for malpractice if he told his clients the

Case 1:12-cv-11€ RWZ Document 1 Filed 08/31/12 age 24 of 43

truth, i.e., that his malpractice was the reason they had to make an unfavorable deal with P&C or risk losing everything.

116. This conflict of interest led Cross to disregard his clients' instructions and deprived them of the ability to exercise control over, and to make relevant and important decisions about, their case.

117. Cross failed to use his clients' first-filed status to negotiate a more favorable sharing agreement with P&C. This was contrary to his clients' instructions and a violation of CRPC Rules 1.1 and 1.2(a) concerning "Competence" and "Allocation of Authority."

118. In addition, Cross failed to address the fact that Thorpe had asked P&C to evaluate his qui tam case against GSK in February of 2002. After reviewing Thorpe's confidential information, P&C declined to take Thorpe's case. Nevertheless, approximately one year later, P&C proceeded to file complaints covering the same drugs as in Thorpe and Hamrick's Original Complaint. Cross failed to research P&C's ethical obligations to Thorpe as a prospective client, failed to raise the issue with P&C when asked to do so, and failed to use the issue in negotiating the sharing agreement with P&C. This was contrary to his clients' instructions and another violation of CRPC Rules 1.1 and 1.2(a) concerning "Competence" and "Allocation of Authority."

119. At a bare minimum, Cross had a duty to Thorpe and Hamrick to investigate the P&C relators and to assess the value of the claims as to which each relator was first to file, as well as the relative contribution each relator might make in advancing the claims asserted. Had he done that, Cross could have argued that, as first filer on the federal FCA claims and as holder of the best evidence on the off-label marketing of Advair, his clients had the right to the vast majority of the relator share.

Case 1:12-cv-116 RWZ Document 1 Filed 08/31/12 age 25 of 43

120. As a result of his conflict of interest, however, arising from his mishandling of the Original Complaint and the limited resources he could devote to the case, both of which circumstances he hoped to remedy by aligning with P & C, Cross never advised Thorpe and Hamrick properly concerning the sharing agreement, including failing to advise them to seek separate counsel with respect to the sharing agreement with P&C. This was a violation of CRPC Rules 1.4(b) and 1.7(a)(2) concerning "Communication" and "Conflict of Interest," respectively.

121. Had Cross complied with his ethical obligations and self-reported his mistakes and conflict of interest promptly after receiving P&C's first amended complaint, Thorpe and Hamrick would have discharged Cross in 2003 rather than in 2009. Thus, Cross would not be in a position to claim the amount of compensation he currently claims.

122. Finally, the sharing agreement had important implications for Cross's contingency fee. The effect of the sharing agreement was to remove much of the responsibility for working the case from Cross, as P&C could be relied upon to push the case forward. On information and belief, the sharing agreement with P&C allowed Cross to avoid issues about the deficiencies of the Original Complaint and to ride the coat-tails of P&C.

123. CRPC Rule 1.5 concerning "Fees" requires that all fees be reasonable. At a minimum, therefore, any agreement with P&C that reduced Cross's workload should have been accompanied by a corresponding reduction in his fee. The 45% contingency fee in place at that time was predicated on Cross handling the matter alone, which was no longer to be the case. Even after Cross lowered his contingent fee in 2007 to 40%, which is the highest end of what is reasonable in a qui tam case, his fee was still excessive in light of the work sharing arrangement he engineered with P&C.

**Cross Negligently Delays Filing an Amended Complaint until 2005**

124. On January 28, 2003, Cross wrote to Thorpe and Hamrick that "there have been a couple of new allegations that you two have brought to my attention since I filed the complaint," and that they could amend the complaint "at least once before the unsealing."

125. Instead of amending the Original Complaint, however, Cross wrote to Thorpe and Hamrick on January 29, 2003 that he "would write a letter to the DOJ that adds the new items to the investigation. Then we can consider whether or not to amend the complaint, but we will already have a record that we pointed this stuff out and assisted the government."

126. Once again, Cross's advice to inform the government of new allegations by way of letter as opposed to amendment of the complaint was erroneous and incompetent. First-to-file status is established by the earliest well-pleaded complaint of a particular set of facts. Thus, contrary to Cross's advice, there is no "advantage to a relator putting off the first amendment of the complaint" where the relator has information that permits adding new, well-pleaded allegations to the complaint. On the contrary, in such a situation, counsel is bound to make every effort to amend promptly.

127. On February 4, 2003,Cross sent a CD containing Thorpe and Hamrick's initial document production to the DOJ on February 4, 2003. In his cover letter, Cross noted the documents he received after filing the Original Complaint as follows: pre-selling Lotronex; Serevent problems; and meeting with "thought leaders" to discuss respiratory issues and off-label topics.

128. On February 11, 2003, Thorpe wrote to Cross that "Paxil would be a good addition to our suit, and it is definitely as big as COPD in its illegal promotion activities." Cross responded that "it's definitely something that you will want to bring to the attention of the

investigators during the interview. I don't know that it's necessary to amend the Complaint at this point." Here again, Cross's advice was negligent and incompetent.

129. Cross's delay in preparing an amended complaint allowed the relators represented by P&C to file their first amended complaint June 10, 2003. It was in that complaint that they first asserted federal anti-kickback claims and state false claims act claims. Had Cross amended the Original Complaint before June 2003, Thorpe and Hamrick would have been in a stronger bargaining position with the P&C relators.

130. Only after receiving P&C's first amended complaint on July 25, 2003 did Cross give any further thought to amending the Original Complaint. He e-mailed Thorpe and Hamrick on July 30, 2003, stating "[a]s you know, we need to look at working up an amended complaint if possible to include additional stuff that we've gotten since the first complaint was filed. When you've looked at the [the P&C] complaint I sent out, give me a call."

131. Thorpe, who had previously asked Cross to file an amended complaint, continued to insist on amending the Original Complaint. On August 4, 2003, he wrote: "We have a lot that they [P&C] do not have. I think we should amend ASAP, and give them a copy so we have more leverage."

132. Cross responded: "I agree on amending the complaint but we need to do it carefully and well....I'd like to put August 31 as the target date for that."

133. Cross then allowed the August 31 target date to pass without amending the complaint. Months later, on November 24, 2003, Cross explained away his lack of diligence as follows:

> Greg and Blair This [sic] is complicated but, just to clarify the 'one amendment' rule that I've explained earlier in the case: the plaintiff has an opportunity to amend the complaint once prior to service; after that plaintiff can amend as many times as he wants, but the

> other side must be given notice and an opportunity to object, and, if objecting, a court may nevertheless permit the amendment 'when justice so requires.' ... Once you've filed the first amended complaint, you've essentially blown your wad - the only way you can add something later is after the defendant has been served. ... Therefore, there is an advantage to a relator putting off the first amendment of the complaint, particularly when you are able to develop additional current information, as we have been able to do because Blair is still a GSK employee....Because what you don't put in that first amended complaint, you may not get a chance to benefit from later."

134. Cross's erroneous advice regarding the "one amendment rule" was another example of his ongoing incompetence, negligence and malpractice. Cross knew or should have known that in FCA cases the filing of multiple amended complaints prior to serving the defendant is not only permitted, but commonplace. Indeed, Cross himself wound up filing four amended complaints between 2005 and 2009.

135. In his November 24, 2003 email, Cross indicated that he would not have enough time to prepare an amended complaint until after December: "I'll do my best to get it out, but I have back to back trials in federal and state court in December that are not going to go away. If you want to help, you can start putting together stuff (details) that you want included and I will consider that, along with the rest of the stuff I already have."

136. On December 12, 2003, Thorpe again indicated his desire to get the amended complaint filed as quickly as possible, and that he was upset at the lack of progress in preparing it. Cross again responded with a reference to his other obligations, and advised that only the contents of the original complaint mattered with respect to a relator's first-to-file status: "We are the first to file in this case, and the court, for that issue, looks only to the original complaint, not the amended complaint. I've explained that before." Once again, Cross's advice was incompetent and negligent.

137. Instead of amending the Original Complaint, Cross focused on persuading Plaintiffs to enter into a sharing agreement with P&C.

138. In the months that followed the signing of the sharing agreement, Thorpe repeatedly inquired after the status of the amended complaint. To the extent Cross responded to these inquiries at all, he consistently downplayed the importance of filing an amended complaint in a timely fashion.

139. On April 24, 2004, Cross wrote to Thorpe and Hamrick as follows: "I'm still working on the amended complaint - I've been concentrating on a combined theory of off label and anti-kickback, but we really should emphasize the anti-kickback. It seems clear at this point that we're solid even without filing the amended complaint, but it feels like Greg you feel strongly about it, so I'm continuing to collate the documents both you guys have submitted and sorting out the incidents that should be included."

140. Cross's failure to amend the Original Complaint in a timely fashion was gross negligence. In addition, Cross failed to follow his clients' instructions in violation of Rule 1.2, and failed to act with the competence and diligence required by Rules 1.1 and 1.3.

141. Eventually, Thorpe and Hamrick took it upon themselves to prepare a rough draft of an amended complaint. If they had not done so, Cross might never have filed one.

142. Ultimately, Cross failed to file an amended complaint on behalf of Thorpe and Hamrick until April 27, 2005 (the "First Amended Complaint"), well over two years after the Original Complaint was filed. As a result, certain drugs that Cross negligently omitted from the Original Complaint, and which were never included in a P&C complaint, failed to receive the attention they deserved in the investigation and development of the case, including but not limited to Paxil.

**Cross Prevents his Clients from Assisting with the Case**

143. In 2008, the United States agreed to let the relators and their counsel mine the documents in the government's investigatory file for data that could be used in the case against GSK, subject to a protective order.

144. The protective order signed by Judge Gertner of the District Court of Massachusetts and entered on March 28, 2008 required the relators and their counsel to sign a copy of the protective order as a condition of access to the documents produced to the United States in the course of its investigation of GSK.

145. In March 2008, Cross informed Thorpe and Hamrick, over their strong objections, that they could not participate in mining the Government's documents because the data-mining was limited to attorneys. Cross also informed them that he would not be permitted to share any of the confidential documents with them.

146. Cross did not, however, provide Thorpe and Hamrick with a copy of the protective order.

147. Cross's statements concerning the data-mining and the protective order were knowingly false and misleading. After Thorpe and Hamrick discharged Cross, they discovered that the United States had no objection to their signing the protective order and having access to confidential documents.

148. Cross's statements concerning the data-mining and the protective order constituted egregious violations of CRPC Rule 1.1 concerning "Competence," Rule 1.4 concerning "Communication" and Rule 8.4(c) concerning dishonesty. By wrongfully excluding Thorpe and Hamrick from an active role in the development of their case, a role that the court had authorized and they desired to play, Cross deprived them of the ability to exercise control

over, and to make relevant and important decisions about, their case in violation of Rule 1.2 concerning "Allocation of Authority."

149. As a result of Cross's misconduct, Thorpe and Hamrick were wrongfully prevented from assisting counsel to build and improve the case for all the drugs named in their complaint, to the detriment of both the Government and the relators.

**Cross Negligently Delays Filing a**
**Retaliatory Discharge Claim on Thorpe's Behalf.**

150. As previously mentioned, at the time that Thorpe's employment with GSK was terminated, he signed a severance agreement. GSK breached the severance agreement in the following ways:

(a) GSK failed to make any payment to Mr. Thorpe towards his purchase of his company car;

(b) GSK paid Mr. Thorpe only $44,000 of the $80,000 it had contracted to pay to him for his relocation expenses;

(c) GSK failed to pay Mr. Thorpe his prorated 2002 bonus;

(d) GSK failed completely to pay Mr. Thorpe his Cash Balance Plan Enhancement; and (e) GSK failed to pay for dental insurance to cover Mr. Thorpe's family.

151. Thorpe notified Cross concerning GSK's breaches on September 20, 2002 and again on November 15, 2002. He expressed his desire to bring a wrongful termination action if GSK failed to cure the breaches.

152. As GSK's breach of the severance agreement was material, Thorpe had rights that he sought to vindicate through Cross. Cross, however, negligently failed to take prompt action either to enforce the severance agreement or set aside the release.

153. Although Thorpe emailed Cross a summary of the facts concerning his employment dispute with GSK and the negotiation of the severance agreement on December 3, 2002, Cross negligently failed to include a retaliatory discharge claim under §3730(h) of the FCA in the Original Complaint, even though Cross's internal reporting of off-label promotions and kickback schemes led directly to his separation from the company.

154. It was not until Cross filed the First Amended Complaint in April 2005 that he brought a retaliation claim on Thorpe's behalf, more than two years after Thorpe's employment with GSK terminated.

155. Cross negligently assumed that the six-year limitation period for FCA claims would apply to §3730(h) claims, even though he knew or should have known that there was substantial grounds for a difference of opinion over this issues even among the Circuit Courts of Appeal, two of which had disagreed over this issue. Cf. *Neal v. Honeywell Inc.*, 33 F. 3d 860, 865-866 (7th Cir. 1994) (holding that FCA 6-year period applies), with *United States ex rel. Lujan v. Hughes Aircraft Co.*, 162 F. 3d 1027, 1034-1035 (9th Cir. 1998) (holding that most closely analogous state limitations period governs).

156. Cross's failure to include a § 3730(h) claim in the Original Complaint and his unreasonable delay in filing the First Amended Complaint potentially subjects Thorpe's §3730(h) claim to a statute of limitations defense under the holding in *Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 545 U.S. 409 (2005), which resolved the conflict between the circuits by rejecting the view that the FCA's six year statute of limitations applies to § 3730(h) claims.

Case 1:12-cv-11€ ·RWZ Document 1 Filed 08/31/12 age 33 of 43

**Cross Fails To Commit The**
**Requisite Time And Resources To The FCA Case**

157. The FCA Case implicated billions of dollars in pharmaceutical sales by one of the largest pharmaceutical companies in the world.

158. Rather than devote the time and resources such a case demands, Cross dithered for more than a year before filing a twelve-page complaint.

159. As soon as he learned that P&C had filed a complaint, Cross began a campaign to convince the Plaintiffs that they had no choice but to give up half of any relator's share, despite the fact that the Original Complaint was filed first.

160. The sharing agreement between Thorpe and Hamrick and the P&C relators served to obscure Cross's mishandling of the Original Complaint and failure to amend it promptly and allowed Cross to rely heavily on P&C to develop the case.

161. In an email dated December 10, 2003, prior to the sharing agreement with the P&C relators, Thorpe wrote to Cross concerning the delay in amending the Original Complaint: "[I]f some extra help is needed, then we think you should get somebody." Even though he was unable to devote the necessary time and effort to amending the Original Complaint, Cross refused to get help: ""[W]e don't need additional lawyers to file the amended complaint - in fact, the main problem with bringing additional lawyers at this point is the time to get them up to speed cancels the time they'd save by coming on board. I'm confident we can get an amended complaint in the next couple of weeks to be filed before Dec. 31st." Cross's promise to amend by the end of December 2003 was false, as he failed to amend for another 15 months until April 2005. This failure was the result of insufficient commitment of time and resources, which Cross failed to acknowledge and correct at any time during his representation.

162. As of September 30, 2009, shortly before he was terminated as Plaintiffs' counsel, Cross alleged to Plaintiffs that he had spent only 2,000 hours on the FCA Case over a period of seven years. His costs were under $34,000.00.

163. On information and belief, P&C did the great majority of the work on the case.

164. Cross did not perform sufficient work to justify anything remotely resembling a 40% fee. Once P&C became involved in the case, Cross's role changed so that the work he performed thereafter was no longer the same as nor what was intended at the time when Thorpe and Hamrick retained him. On information and belief, Cross effectively ceded primary control of, and responsibility for, the case to P&C after he persuaded the clients to enter into a 50-50 sharing arrangement with P&C's relators.

165. Had Cross devoted the time and resources required, he would have filed the Original Complaint sooner and asserted anti-kickback and state false claims act claims. He would have amended the Original Complaint before P&C filed, and would have worked up the drugs that P&C did not have in its complaint or did not work up. Because of his failure to expend the time and resources required, Cross lost the opportunity for the government to obtain a larger settlement and for his clients to obtain a larger relators' award.

166. In 2009, Thorpe and Hamrick sought to involve another qui tam lawyer as co-counsel, as a result of Cross's pattern of delay, incompetence, failure to communicate, and failure to put sufficient time and resources into developing the case. In particular, Cross was not giving adequate attention to Paxil and other drugs besides Advair. Cross refused, because it would have reduced his fee.

167. In the course of consulting other qui tam lawyers, Thorpe and Hamrick discovered that Cross's legal advice concerning the effect of the GSK/Thorpe release was

erroneous; that Cross mishandled the Original Complaint and the First Amended Complaint; and that Cross put his own interests ahead of his clients' interests when he negotiated the sharing agreement with P&C.

168. On October 2, 2009, Cross filed a fourth amended complaint. The complaint contained various errors and was again filed without first being shown to Thorpe and Hamrick and without obtaining their approval.

169. Thorpe and Hamrick discharged Cross by letter dated October 21, 2009.

**Cross Falsely Denies a Relationship with P&C**

170. In 2004, Cross disclosed to Thorpe and Hamrick that he had agreed to serve as local counsel for P&C in an unrelated matter.

171. In 2008, Cross stated emphatically that he had never received anything from P&C.

172. In 2009, he again agreed to serve as local counsel for P&C. This time, however, he did not disclose his arrangement with P&C to Thorpe and Hamrick.

173. On information and belief, Cross did other work for P&C, which he should have disclosed when his clients asked him about his relationship with P&C. Instead, Cross denied any relationship, because he feared that Thorpe and Hamrick would view it negatively.

**Cross's Claim For Attorney's Fees**

174. On November 12, 2009, Cross filed a notice of attorney's lien in the FCA Case against any recovery allocated to Plaintiffs as their relators' share.

175. Cross asserted in his notice that Thorpe and Hamrick discharged him without cause. Cross's assertion was and is false. Although this falsehood has been called to his attention several times, Cross has refused to correct his notice.

176. Cross improperly asserted a retaining lien before producing his clients' file, in violation of Colorado's governing statute C.R.S. §12-5-120 as interpreted in *People v. Radinsky*, 512 P.2d 627 (Colo. 1973). Although he later produced a poorly organized case file to replacement counsel, Cross refused to amend his notice of lien to delete the retaining lien. On information and belief, Cross also failed to produce the file in the same form in which he organized and maintained it

177. Cross's notice of a charging lien was also defective because it failed to specify the basis and amount of the lien as required by C.R.S. §12-5-119.

178. Cross attached a copy of his 40% contingent fee agreement to the notice of attorney's charging lien. However, as set forth in the fee agreement itself, an attorney who is discharged from a contingent fee case prior to recovery is not entitled to a contingent fee, but only to the reasonable value of his services at the time he was discharged. *People v. Radinsky*, 512 P.2d 627 (Colo. 1973)

179. Cross is not entitled to 40% of the relator's share in this case. He has not been involved in the case since 2009. Even while he was involved in the case, he did not devote to it the time and resources that he promised he would, nor the time and resources necessary to do a competent job. Once P&C became involved, Cross took a subordinate role.

180. On information and belief, Cross's assertion of a lien and a demand that 40% of Thorpe and Hamrick's recovery is intended to pressure them to settle for an excessive amount.

181. Under the circumstances, Cross's assertion of a lien for 40% of his client's recovery is in violation of CRPC Rule 1.5(a) concerning "Fees" because it is unreasonable and Rule 8.4(c) concerning "Misconduct" because it is dishonest.

182. It is a well-established principle that, where an attorney is discharged because of serious misconduct involving fraud, breach of fiduciary duty, or grossly unprofessional misconduct, his right to compensation is subject to reduction and forfeiture.

183. Cross's malpractice and conflicts of interest with his clients, and his efforts to conceal those matters to his clients' detriment instead of disclosing them, constitutes grossly unprofessional conduct, and Cross therefore should forfeit any claim for compensation from Thorpe and Hamrick.

184. In the alternative, and without admitting any liability to compensate Cross, in the event the Court determines that Cross's misconduct does not justify complete forfeiture of compensation, Cross's compensation should be limited to the fair value of the reasonable hours actually spent by Cross in connection with the FCA Case, subject to recoupment by plaintiffs as a result of Cross's malpractice and subject to reduction for unethical conduct.

**COUNT I**
**ATTORNEY MALPRACTICE –**
**THORPE AGAINST CROSS,**
**BENNETT, AND CROSS & BENNETT**

185. Plaintiff Thorpe incorporates the allegations in paragraphs 1 through 184 as if set forth fully herein.

186. Cross negligently gave Thorpe incorrect advice concerning the effects of the severance agreement with GSK and failed to advise Thorpe of the benefits of returning to work at GSK.

187. Cross was negligent in failing to file Thorpe's retaliatory discharge claim before April 2005.

188. Cross covered up his mistakes instead of disclosing them and allowed his self-interest to taint his advice to his client.

189. Cross failed to devote the necessary time and resources to evaluating the qui tam case in a timely fashion.

190. As a result of Cross's delay, Thorpe was forced to make a decision about his employment with GSK without knowing if Cross would take his FCA Case.

191. As a result of Cross's negligence and misconduct, Thorpe gave up 50% of the relator's share to Hamrick.

192. As a result of Cross's negligence and misconduct, Thorpe may lose the value of his retaliatory discharge claim.

193. Cross's representation of Thorpe was characterized by an egregious pattern of delay, incompetence, conflict of interest, negligence, lack of diligence, failure to properly analyze, failure to properly advise, and dishonesty. Cross repeatedly breached the duty of care and the duty of loyalty, resulting in financial loss to Thorpe and Hamrick.

194. Cross & Bennett and Joseph Bennett are liable with Cross for Cross's malpractice.

WHEREFORE, plaintiff Thorpe respectfully requests judgment against Keith Cross, Joseph Bennett and Cross & Bennett in an amount in excess of $75,000.00.

**COUNT II**
**ATTORNEY MALPRACTICE –**
**THORPE AND HAMRICK AGAINST CROSS,**
**BENNETT, AND CROSS & BENNETT**

195. Plaintiffs Thorpe and Hamrick incorporates the allegations in paragraphs 1 through 194 as if set forth fully herein.

196. Cross was grossly negligent in his preparation of the Original Complaint and his failure to promptly amend the Original Complaint to include additional information that his clients provided. Cross negligently failed to include federal anti-kickback claims and state false claims act claims. Cross negligently failed to file the Original Complaint in the District of Massachusetts. Had Cross handled the case properly, Thorpe and Hamrick would not have been forced to give up 50% of the relator's share to the P&C relators.

197. Cross was also negligent in negotiating the 50-50 sharing agreement with Phillips & Cohen, in that he failed to raise the issue of P&C's prior dealings with Thorpe and failed to take proper advantage of the fact that Thorpe and Hamrick were first to file. Cross allowed his personal interests and his desire to cover up his mistakes to influence his negotiation of the 50-50 sharing agreement with the P&C relators, to the detriment of his clients.

198. Cross knowingly misled his clients concerning the March 28, 2008 protective order.

199. Cross covered up his mistakes instead of disclosing them and allowed his self-interest to taint his advice to his clients.

200. Cross failed to devote the necessary time and resources to the qui tam case.

201. As a result of Cross's negligence and misconduct, Thorpe and Hamrick gave up 50% of the relator's share to the P&C relators, leaving Thorpe and Hamrick with 25% each.

202. As a result of Cross's negligence and misconduct, Thorpe and Hamrick lost the opportunity to assist the Government's analysis of claims related to Paxil and other drugs. Had Thorpe and Hamrick participated in mining the Government's documents for data, there would have been a greater recovery in the FCA Case.

Case 1:12-cv-11( -RWZ Document 1 Filed 08/31/12 age 40 of 43

203. Cross's representation of Thorpe and Hamrick was characterized by an egregious pattern of delay, incompetence, conflict of interest, negligence, lack of diligence, failure to properly analyze, failure to properly advise, and dishonesty. Cross repeatedly breached the duty of care and the duty of loyalty, resulting in financial loss to Thorpe and Hamrick.

204. Cross & Bennett and Joseph Bennett are liable with Cross for Cross's malpractice.

WHEREFORE, plaintiffs Thorpe and Hamrick respectfully request judgment against Keith Cross, Joseph Bennett and Cross & Bennett in an amount in excess of $75,000.00.

## COUNT III

## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF THORPE AND HAMRICK AGAINST CROSS, BENNETT, AND CROSS & BENNETT

205. Plaintiffs Thorpe and Hamrick incorporate the allegations in paragraphs 1 through 204 as if set forth fully herein.

206. Plaintiffs Thorpe and Hamrick are in need of the Court's assistance in resolving the parties' differences regarding Defendant Cross's entitlement to payment for fees he has allegedly incurred, because Cross, Bennett and Cross & Bennett have filed a notice of attorney's lien that is impeding the distribution of the relator's share in the FCA Case.

207. Thorpe and Hamrick seek a declaration that Cross, Bennett and Cross & Bennett have forfeited all right to compensation as a result of an egregious pattern of negligence and professional misconduct, including, but not limited to, incompetence and advice tainted by conflict of interest.

WHEREFORE, plaintiffs Thorpe and Hamrick respectfully request that this Court enter Judgment in their favor:

(a) Declaring that defendant Cross, Bennett and Cross & Bennett are not entitled to any payment for fees or costs incurred in connection with the representation of plaintiffs Thorpe and Hamrick.

(b) Striking the Attorney's Lien filed by Cross, Bennett and Cross & Bennett in the FCA Case; and

(c) Such other relief as the Court deems just and appropriate.

**COUNT IV**
**DECLARATORY JUDGMENT AND**
**INJUNCTIVE RELIEF THORPE AND HAMRICK AGAINST**
**CROSS, BENNETT, AND CROSS & BENNETT**

**(Request For Alternative Relief)**

208. Plaintiffs Thorpe and Hamrick incorporate the allegations in paragraphs 1 through 207 as if set forth fully herein.

209. In the alternative to Count III, should the Court determine that Cross's, Bennett's and Cross & Bennett's conduct does not rise to a level requiring that they forfeit their entire claim for compensation, Plaintiffs seek the Court's assistance in resolving Cross's, Bennett's and Cross & Bennett's claim for fees, and Plaintiffs' damages arising from Cross's, Bennett's and Cross & Bennett's misconduct.

WHEREFORE, plaintiffs Thorpe and Hamrick respectfully request that this Court enter Judgment in their favor:

(a) Declaring that any entitlement to payment that defendants may be able to establish is limited to Cross's, Bennett's and Cross & Bennett's actual billed time at a reasonable rate, to be offset by the damages suffered by plaintiffs as a result of Cross's, Bennett's and Cross & Bennett's malpractice and ethical violations;

(b) The damages suffered by Plaintiffs are more than sufficient to off-set any reasonable claims for attorney's fees Cross, Bennett and Cross & Bennett might make, therefore Cross, Bennett and Cross & Bennett are not entitled to compensation from Plaintiffs for attorney's fees;

(c) Striking the Attorney's Lien filed by Cross, Bennett and Cross & Bennett in the FCA Case; and

(d) Such other relief as the Court deems just and appropriate.

/s/ Matthew Fogelman

Matthew J. Fogelman (BBO #653916)
FOGELMAN & FOGELMAN LLC
100 Wells Avenue
Newton, MA 02459
617-559-1530
**mjf@fogelmanlawfirm.com**

and

Of Counsel:

William J. Leonard
Richard P. Limburg
Obermayer Rebmann Maxwell & Hippel LLP
1617 John F. Kennedy Blvd.
Philadelphia, PA 19103
215-665-3000
william.leonard@obermayer.com
richard.limburg@obermayer.com

Dated: August 31, 2012