## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE THIRD-PARTY SUBPOENA FOR DEPOSITION | NO.  1:13-mc-01331-JEB-DAR<br><br>Related Case:<br>NO.  1:13-mc-00405-JEB-DAR<br>District Court for the District of Columbia |
| GREGORY THORPE, *et al*.<br><br>Plaintiffs<br><br>vs.<br><br>KEITH F. CROSS, *et al.*<br><br>Defendants | Underlying Case:<br>NO.  1:12-cv-11632-RWZ<br>Pending in District Court for the<br>District of Massachusetts |

**PLAINTIFFS' RESPONSE TO PHILLIPS & COHEN LLP'S MOTION TO QUASH OR, IN THE ALTERNATIVE, FOR PROTECTIVE ORDER RE: SUBPOENA FOR DEPOSITION OF ERIKA KELTON**

4769055.3

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................1

II.    SUMMARY OF FACTS AND PROCEDURAL HISTORY.................................3

    A.    The GlaxoSmithKline Lawsuits..................................................................3

    B.    Plaintiffs' Malpractice Complaint Against C&B.........................................4

          C&B Negligently Prepares the Original Complaint.. ..................................4

          Cross Convinces Plaintiffs to Cut a Deal with P&C's Whistleblowers to Cover Up His Malpractice.. ........................................................................5

          C&B Lies to Plaintiffs About the Protective Order....................................6

          Cross Falsely Denies a Relationship with P&C.........................................7

III.    ARGUMENT .....................................................................................7

    A.    Plaintiffs are Entitled to Take Erika Kelton's Deposition Because the Information Plaintiffs Seek is Not Work Product and Crucial to Plaintiffs' Malpractice Lawsuit.................................................................7

        1.    The Federal Rules of Civil Procedure gives parties broad latitude to take discovery and depose witnesses, including attorneys.. ........7

        2.    P&C has the burden to prove that Plaintiffs' deposition of Ms. Kelton will require the disclosure of privileged information...........7

        3.    The information Plaintiffs seek is not protected by the work product doctrine ...........................................................................8

        4.    Applying the work product doctrine to Ms. Kelton's testimony regarding her communications with Cross does not advance the purposes of the work product doctrine under <u>Hickman</u>................16

        5.    Even if Kelton's Recollection of Communications with Cross Following the Sharing Agreement Are Work Product They Are Not Protected From Discovery From Plaintiffs Because of the Joint Prosecution of the GSK Lawsuits Under the Sharing Agreement...................................................................................17

        6.    Plaintiffs have a substantial need for Ms. Kelton's deposition......18

7.      P&C  is not entitled to the heightened protection afforded
        opposing counsel under <u>Shelton</u> .....................................................19

8.      Even if <u>Shelton</u> applied, Plaintiffs easily satisfy <u>Shelton's</u>
        three-part test ................................................................................21

        (a)  The information Plaintiffs seek is relevant.............................21

        (b)  The Information Plaintiffs Seek is Not Protected by the
             Work Product Doctrine ..........................................................22

        (c)  The Information Plaintiffs Seek is Crucial to Their
             Malpractice Lawsuit...............................................................22

9.      Plaintiffs' Subpoena does not impose an undue burden on
        P&C or Ms. Kelton ......................................................................22

III.    CONCLUSION...................................................................................23

4769055.3

Plaintiffs, Gregory Thorpe and Blair Hamrick, hereby submit this Memorandum of Points and Authorities in Opposition to the Motion to Quash or, in the Alternative, for Protective Order Re: Subpoena for Deposition of Erika Kelton ("Motion to Quash") filed by Phillips and Cohen, LLP (Dkt. 1).

## I.      <u>INTRODUCTION</u>

This matter concerns a third-party deposition subpoena (the "Subpoena") served by Plaintiffs for the deposition of Erika Kelton, an attorney for the law firm of Phillips & Cohen ("P&C").  Plaintiffs seek to depose Ms. Kelton in connection with Plaintiffs legal malpractice lawsuit against the named Defendants, Keith Cross, Joseph Bennett and Cross & Bennett PC (collectively, "C&B") in a matter before the United States District for the District of Massachusetts.  In their legal malpractice claim, Plaintiffs sued C&B in connection with their representation of Plaintiffs, as whistleblowers ("relators"), in a *quit tam* lawsuit filed against GlaxoSmithKline LLC ("GSK") under the False Claims Act (the "FCA").

The principal thrust of the malpractice claim is that C&B's *qui tam* complaint was so deficient and so vulnerable to attack by subsequent filers that, when second filers did come along, represented by P&C, C&B sought to cover-up their malpractice by persuading Plaintiffs (their clients at the time) to enter into a deal with P&C's clients, in which Plaintiffs gave away fifty percent (50%) of their relators' share to P&C's clients – the entire amount of which was presumptively Plaintiffs, as the first-filers under the FCA.  As Plaintiffs would later discover in 2009, C&B did this to avoid a confrontation with P&C that would have revealed to Plaintiffs C&B's malpractice and the deficiencies of the complaint that C&B prepared.  A side benefit of the deal was that the arrival of competent *qui tam* counsel in the matter, P&C, allowed the incompetent lawyers to sit back and ride P&C's coattails for the remainder of the case.

Plaintiffs fired C&B for cause in October 2009.  Two and a half years later, both Plaintiffs' and P&C's clients' consolidated *qui tam* lawsuits against GSK finally settled.  Despite the fact that C&B was removed for cause during the final quarter of the case, C&B filed a counterclaim in the malpractice action seeking a *quantum meruit* fee of approximately $30 million dollars or forty percent (40%) of Plaintiffs' relators' share, that is, the full value of C&B's defunct contingency-fee agreement with Plaintiffs.

Ms. Kelton was lead counsel for P&C's representation of its relator clients for their *qui tam* lawsuit against GSK.  Ms. Kelton worked with Mr. Cross for over six (6) years until Plaintiffs replaced C&B with new counsel.

Plaintiffs seek <u>only</u> to depose Ms. Kelton as to what Defendant Keith Cross told Ms. Kelton and what Ms. Kelton told Mr. Cross regarding the *qui tam* lawsuits against GSK.

In its Motion to Quash, P&C objects to Plaintiffs' Subpoena as seeking only work product.  P&C does not (and cannot) argue that the communications between Ms. Kelton and Mr. Cross are privileged, work product, and/or not relevant.  Rather, P&C argues that Ms. Kelton's *recollection* of such non-privileged, non-work-product communications are work product.  None of the policy concerns at issue in <u>Shelton</u> are present here.

P&C's Motion to Quash is without merit.  All of the decisions that P&C relies upon involve  a party seeking discovery from opposing counsel representing a party to the litigation in which the discovery was sought.  Furthermore, in each of the decisions, the party seeking to depose an opposing party's lawyer sought to use the lawyer's testimony <u>against</u> the lawyers' client.

By contrast, in this case, P&C's clients are not parties to Plaintiffs' malpractice lawsuit, and Plaintiffs are not asking P&C to testify about its clients' communications for the purpose of using such communications against them.  Furthermore, as P&C admits in its Motion to Quash, P&C and Ms. Kelton were Plaintiffs' shared "resource."  Motion to Quash, p. 3 (Dkt. 1).  As

2

Plaintiffs' shared "resource," Plaintiffs are entitled to depose Ms. Kelton as to her communication with Cross.  P&C and Ms. Kelton waived any claim of work product of her recollections of such communications when P&C's clients entered into the sharing agreement with Plaintiffs, in which they agreed to pool their resources (**including the resources of their respective attorneys, P&C and C&B) … .**"  Id.

## II.   SUMMARY OF FACTS AND PROCEDURAL HISTORY

### A.   The GlaxoSmithKline Lawsuits.

Plaintiffs hired C&B to represent them in their whistleblower lawsuit against GSK.  C&B filed Plaintiffs' lawsuit against GSK in the United States District Court for the District of Colorado on January 2, 2003.  The Original Complaint alleged only federal FCA claims against GSK for off-label promotion of six (6) prescription drugs.  The Original Complaint failed to allege any kickback or state FCA claims.

Prior to Plaintiffs hiring C&B, Plaintiff Greg Thorpe asked P&C to evaluate his whistleblower lawsuit against GSK in February of 2002.  Thorpe completed a confidential case-evaluation questionnaire and submitted it to P&C along with documentary evidence supporting his allegations against GSK.  After reviewing Thorpe's confidential, privileged information, P&C declined to represent Thorpe in a letter dated February 25, 2002 signed by Bonny Harbinger, a junior associate at P&C.

A little more than one year later, on April 7, 2003, P&C filed a whistleblower lawsuit against GSK on behalf of two other whistleblowers in the United States District Court for the District of Massachusetts.  The P&C complaint, which was promptly amended two months later, repeated a number of the claims that Thorpe had asserted in the confidential, privileged information that he submitted to P&C in February 2002.  Unlike C&B's Original Complaint, P&C's amended complaint was competently drafted.  It comprised ninety-six (96) pages and

3

included kickback and state FCA claims. C&B's Original Complaint was a mere thirteen (13) pages long.

Under the FCA, only the first-filed relator is entitled to a relator's share. 31 U.S.C. § 3730(b)(5). The first-to-file rule only protects the claims which the relator actually asserts. An FCA claim that is inadequately pleaded or insufficiently specific leaves open a door for a second properly pleaded action to claim first-to-file status. See United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 32 (1st Cir. 2009).

Plaintiffs and P&C's clients entered into a 50/50 sharing agreement. Following the sharing agreement, the two matters were supervised by the United States Attorney's Office in Massachusetts, with which P&C had the primary relationship. C&B's Colorado lawsuit was transferred to, and consolidated with, P&C's action in Massachusetts in 2010.

The Government ultimately recovered over $1 billion dollars in settlement of the whistleblower lawsuits against GSK. The Massachusetts court is currently holding approximately $30 million dollars pursuant to a lien claim filed by C&B.

**B.      Plaintiffs' Malpractice Complaint Against C&B.**

**C&B Negligently Prepares the Original Complaint**

In their malpractice Complaint against C&B, Plaintiffs allege that C&B was grossly negligent in preparing the Original Complaint. The Original Complaint failed to state all of the claims that Plaintiffs brought to C&B's attention, neglecting to include certain legal theories arising out of GSK's illegal marketing of some drugs and failing to mention GSK's illegal marketing of other drugs completely. In particular, C&B failed to include state FCA claims and illegal kickback claims. C&B's failure to assert all available claims in the Original Complaint, opened the door under the "first-to-file" rule for a subsequent filer, like P&C, to undermine Plaintiffs' first-filed status through a later filed complaint that included the missing claims. Complaint, ¶¶ 81-123.

4

### Cross Convinces Plaintiffs to Cut a Deal with
### P&C's Whistleblowers to Cover Up his Malpractice

Six (6) months after C&B filed its deficient FCA complaint on behalf of Plaintiffs, and more than two years before C&B filed any amendment seeking to cure the evident deficiencies in its Original Complaint, the U.S. Attorneys' Office advised C&B that P&C had filed a similar FCA complaint against GSK in Massachusetts three months after Plaintiffs' complaint was filed in Colorado.  Complaint, ¶96.

Cross received a copy of P&C's amended complaint on July 25, 2003.  After reading P&C's amended complaint, Defendant Keith Cross stated to Plaintiffs in an e-mail on July 28, 2003 that "[the P&C complaint is] 96 pages and has significantly more detail than we do, but overall, the 'cause of action' is the same."  *This was not true*.  C&B failed to tell Plaintiffs that the P&C amended complaint included state false claims act claims and federal anti-kickback claims that C&B should have included in its Original Complaint.  C&B also failed to explain that its negligence had allowed P&C's relators to become first-filed on those claims.  Id. at 105-106.

Over the course of the next six (6) months, C&B urged Plaintiffs to share the relator fee, which a properly drafted FCA complaint would have made theirs alone as first-in-time filers.  C&B ultimately convinced Plaintiffs to cut a generous 50-50 deal with P&C's clients, despite Plaintiffs' repeated demands that C&B take a more aggressive position.  During this time, Plaintiffs expect that P&C pointed out to C&B the deficiencies of its Original Complaint.  Whether or not P&C and C&B had such discussions, the fact remains that C&B prevailed on Plaintiffs to give up fifty percent (50%) of the relators' share without self-disclosing to Plaintiffs the deficiencies of the Original Complaint.  Id. at 111-112.

In negotiating the 50-50 sharing agreement, Cross also refused to aggressively challenge P&C, as the clients demanded, on the question of whether P&C had used any of Thorpe's confidential information in the representation of its subsequent clients.  After reviewing Thorpe's

confidential, privileged information in February of 2002 and declining to take the case, P&C proceeded to represent other clients, who had directly adverse interests, in the same matter.  Id. at 114-118.

C&B's handling of the sharing agreement with P&C was tainted by a substantial conflict of interest.  C&B allowed its personal interests and its desire to cover up its mistakes to influence its negotiation of the sharing agreement with the P&C relators, to the detriment of its clients.  Id. at 96-123.  The sharing agreement not only allowed C&B to avoid issues about the deficiencies of the Original Complaint, but also to cede responsibility for the case and ride the coattails of P&C.  Id. at 113-123.

It was not until 2009 when Plaintiffs sought to involve another *qui tam* lawyer as co-counsel with C&B that Plaintiffs discovered, among other things, that C&B mishandled the Original Complaint and that C&B put its own interests ahead of their clients' interests when it negotiated the sharing agreement with P&C.  Plaintiffs discharged C&B for cause on October 21, 2009.  Id. at 166-169.

### C&B Lies to Plaintiffs About the Protective Order and Later Claims That His Understanding of the Protective Order Was Based on Statements Made by Erika Kelton

In the GSK Lawsuits, the government agreed to let the relators and their counsel mine the documents in the government's investigatory file for data that could be used in the case against GSK, subject to a protective order.  C&B informed Plaintiffs, over their strong objections, that they could not participate in mining the government's documents because the data-mining was limited to attorneys.  C&B also told Plaintiffs that they could not share any of the confidential information developed through data mining with them.  Id. at 143-145.

C&B's statements were false.  After Plaintiffs discharged C&B, they discovered that the protective order permitted relators the same access as their counsel and that the government had no objection to their having access to confidential information.  Id. at 147.

4769055.3

Recently, in response to an ethics investigation in Colorado, Keith Cross has suggested that his original understanding of the Protective Order was based upon statements made by Ms. Kelton regarding the terms of the Protective Order and the government's plan for data mining.

### Cross Falsely Denies a Relationship with P&C

In 2004, Cross disclosed to Thorpe and Hamrick that he had agreed to serve as local counsel for P&C in an unrelated matter.   In 2008, Cross stated emphatically that he had never received anything from P&C.  In 2009, he again agreed to serve as local counsel for P&C.  This time, however, he did not disclose his arrangement with P&C to Thorpe and Hamrick. Id. at 170-172.

## III.   ARGUMENT

A.   Plaintiffs are Entitled to Take Erika Kelton's Deposition Because the Information Plaintiffs Seek is Not Work Product and Crucial to Plaintiffs' Malpractice Lawsuit

**1.   The Federal Rules of Civil Procedure gives parties broad latitude to take discovery and depose witnesses, including attorneys.**

Rule 30(a) provides that "[a] party may take the testimony of any person, including a party, by deposition upon oral examination." Fed. R. Civ. P. 30(a) (emphasis added).  Contrary to P&C's suggestion that attorneys are presumptively entitled to quash all subpoenas seeking their depositions attorneys are not immune from depositions under Rule 30.  In re Arthur Treacher's Franchisee Litig., 92 F.R.D. 429, 437 (ED Pa. 1981).  "If an attorney of record possesses relevant, non-privileged information, that information ought to be discoverable just as it would be if possessed by a party or a non-party to the litigation." Id.

**2.   P&C has the burden to prove that Plaintiffs' deposition of Ms. Kelton will require the disclosure of privileged information.**

The party seeking to quash the subpoena bears the burden of showing that the requested information is privileged or that the subpoena imposes an undue burden.  In re Application For Subpoena To Kroll, 224 F.R.D. 326, 328 (E.D.N.Y. 2004) (citations omitted);  Fed. R. Civ. P.

7

45(c)(3).  "[T]he burden of proving that a subpoena ... is oppressive is on the party moving for

relief on this ground. … The burden is particularly heavy to support a motion to quash as

contrasted to some more limited protection."  Westinghouse Electric Corp. v. City of Burlington,

351 F.2d 762, 766 (D.C. Cir. 1965).

What constitutes unreasonableness or oppression is a matter to be decided in the light of

all the circumstances of the case.  Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395,

403 (D.C. Cir. 1984).  To determine whether a burden is "undue," courts consider the factors set

forth in Rule 26.  Watts v. SEC, 482 F.3d 501, 509 (D.C. Cir. 2007).  Rule 26(b)(2)(C)(iii) limits

discovery if "the burden or expense of the proposed discovery outweighs its likely benefit,

considering the needs of the case, the amount in controversy, the parties' resources, the

importance of the issues at stake in the action, and the importance of the discovery in resolving

the issues."  The district court must balance the relevance of the discovery sought, the requesting

party's need, and the potential hardship to the party subject to the subpoena.  Flanagan v.

Wyndham International Inc., 231 F.R.D. 98, 102-03 (D.D.C. 2005) (citations omitted).

In this case, P&C can establish neither privilege nor undue burden.

### 3.  The information Plaintiffs seek is not protected by the work product doctrine.

Plaintiffs seek only to question Ms. Kelton as to what Defendant Keith Cross said to Ms.

Kelton and what Ms. Kelton said to Mr. Cross in connection with the *qui tam* lawsuits against

GSK.  Plaintiffs do not seek to ask Ms. Kelton about any confidential or private mental

impressions, legal strategy, or other work product that Ms. Kelton may have prepared in

connection with her representation of P&C's clients in the now-settled *qui tam* litigation against

GSK.

Communications between Cross and Ms. Kelton are not protected work product as

between them.  Statements that Cross made to Ms. Kelton and statements that Ms. Kelton made

to Cross are not protected by the work product doctrine because (1) Cross' statements to Ms. Kelton are not her work product to protect and (2) Ms. Kelton waived any work product protection for her statements to Cross by making such statements to Cross.  As Cross was Plaintiffs' lawyer, Ms. Kelton could not reasonably expect that her communications to Cross would be kept secret from Plaintiffs.  In fact, in P&C's related motion seeking to quash Plaintiffs' document subpoena directed to P&C, P&C does <u>not</u> argue that Ms. Kelton's written communications with Cross relating to the GSK Lawsuits are protected work product.[1]

Notwithstanding the narrow scope of the proposed questioning, P&C claims the information Plaintiffs seek is work product.  P&C does not (and cannot) argue that the communications between Ms. Kelton and Mr. Cross are work product.  Rather, P&C argues that Ms. Kelton's *recollections* of such non-privileged, non-work-product communications constitute her work product.  Motion to Quash, pp. 7-10 (Dkt. 1).  In support of its argument, P&C cites to numerous court decisions, including a decision in this District.  All of these decisions, however, involve  a party seeking the deposition of opposing counsel representing a party to the litigation in which the deposition was sought.  Furthermore, in each of the decisions, the party seeking to depose an opposing party's lawyer sought to use the lawyer's testimony <u>against</u> the lawyers' client.

By contrast, in this case, P&C's clients are not parties to Plaintiffs' malpractice lawsuit, and Plaintiffs are not asking P&C to testify about its clients' communications for the purpose of using such communications against them.  Furthermore, as set forth below, Kelton's recollection of communications with Cross following the sharing agreement cannot be protected from Plaintiffs because such communications were intended to benefit Plaintiffs.  P&C admits in its Motion to Quash that in early 2004, Plaintiffs and P&C's clients entered into a sharing

---

[1] <u>See</u> <u>In Re Third Party Subpoena for Documents</u>, NO.  1:13-mc-00405-JEB-DAR, District Court for the District of Columbia, Dkt. 1, pp. 22-23 (P&C's Motion to Quash Document Subpoena).

4769055.3

agreement, in which they agreed to pool their resources (***including the resources of their respective attorneys, P&C and C&B) … .***"  P&C Motion to Quash, 3 (Dkt 1).

In <u>Hickman v. Taylor</u>, 329 U.S. 495 (1947), the Supreme Court held that a party may not depose an opposing party's lawyer as to his interviews of third-party witnesses that the lawyer conducted in connection with the lawsuit in which the deposition was sought.  The <u>Hickman</u> case arose from the sinking of a tugboat and was brought by relatives of the deceased crewmen against the owners.  The owners' lawyer interviewed the survivors.  The survivors gave public testimony before the United States Steamboat Inspectors.  Notwithstanding the availability of the survivors for deposition, the survivors' public testimony, and the owners' answers to interrogatories disclosing all the facts gleaned through the lawyers' interviews, the plaintiffs sought the owners' lawyers' notes as to his interviews of the survivors.  The Supreme Court denied the plaintiffs' discovery request.  The Court concluded:  "We are thus dealing with an attempt to secure the production of written statements and mental impressions contained in the files and the mind of the attorney Fortenbaugh without any showing of necessity or any indication or claim that denial of such production would unduly prejudice the preparation of petitioner's case or cause any hardship or injustice.  For aught that appears, the essence of what petitioner seeks either has been revealed to him already through the interrogatories or is readily available to him direct from the witnesses for the asking."  The Supreme Court described the basic at stake as "whether any of [the discovery devices under the Rules of Civil Procedure] may be used to inquire into materials collected by an adverse party's counsel in the course of preparing for possible litigation."  <u>Hickman</u>, 329 U.S. at 505.

In <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 402 (1981), in-house counsel conducted an internal investigation of questionable payments by Upjohn's foreign subsidiaries to foreign government officials.  As a result of the investigation, Upjohn disclosed the payments to the SEC.  The IRS commenced an investigation and requested the questionnaires and memos

4769055.3

prepared in the course of Upjohn's internal investigation.  The materials were prepared in anticipation of litigation.  The question was how much a showing of necessity was required to justify disclosure of counsel's memos prepared from recollection of oral interviews.  The Court held that such materials, which reveal the attorney's mental impressions in evaluating communications, should not be discoverable simply on a showing of substantial need and inability to obtain the equivalent without undue hardship.  Upjohn Co. v. United States, 449 U.S. 383, 402 (1981).

In In re Grand Jury Proceedings, 473 F.2d 840, 848 (8th Cir. 1973), a prosecutor sought interview notes prepared by counsel for a gas company whose conduct was the target of investigation by the grand jury.  The lawyer had conducted the interviews in anticipation of litigation concerning alleged bribes to public officials.  As such, the attorney's personal recollections and summaries of the interviews were protected work product.  The prosecutor, however, had access to the interviewees and could not establish good cause for disclosure of attorney work-product.

P&C also cites to In re Grand Jury Proceedings for the proposition that opinion work product is absolutely privileged.  Motion to Quash, p. 8.  This is not the law in this Circuit.  Rather, the DC Circuit follows Upjohn, which does not absolutely protect opinion work product, but rather requires a strong showing of substantial need to overcome the work-product protection.  Alexander v. FBI, 192 F.R.D. 12, 20 (D.D.C. 2000)(citing See In re Sealed Case, 856 F.2d 268, 273 (D.C. Cir. 1988)).

The cases United States v. Deloitte, LLP, 610 F.3d 129, 136-138 (D.C. Cir. 2010); In re Cendant Corp. Securities Litigation, 343 F.3d 658, 665 (3rd Cir. 2003); In re Burlington Northern, Inc., 822 F.2d 518 (5th Cir. 1987); and Upjohn Co. v. United States, 449 U.S. 383, 402 (1981) likewise involved discovery of written communications from an opposing party's lawyer in the very cases in which the discovery was sought for use against the lawyers' clients, thus

4769055.3

pitting the lawyer against the lawyer's client.  In each case, the question was how much of a

showing of necessity was required to justify disclosure of counsels' written communications.

P&C's reliance on this Court's decision in Director of Office of Thrift Supervision v.

Vinson & Elkins, 168 F.R.D. 445, 448 (D.D.C. 1996) is misplaced.  In Vinson, the Office of

Thrift Supervision (the "OTS") sought to compel an attorney representing a target of a

government enforcement proceeding to produce his notes and provide oral testimony as to his

client's statements made in a previous FDIC interview regarding his role in a failed savings in

loan.  The client's lawyer and two FDIC lawyers were present at the interview.  The OTS

intended to use the lawyer's notes and testimony to corroborate the FDIC's notes of the

interview to use against the lawyer's client.  The lawyer and the client objected to the subpoena.

They argued, and the District Court agreed, that a lawyer's interview notes are always opinion

work product, undiscoverable without "extraordinary justification."  Director, Office of Thrift

Supervision v. Vinson & Elkins, LLP, 124 F.3d 1304, 1307-1308 (D.C. Cir. 1997).  Based on

this, the District Court also quashed the OTS' subpoena seeking to depose the client's lawyer,

holding "[w]hat lawyers remember is just as privileged as what they write down."  168 F.R.D. at

448 (citations omitted).

The OTC appealed the District Court's decision as to its ruling regarding the lawyer's

notes.  The Appeals Court disagreed with the District Court's ruling that a lawyer's interview

notes are always "opinion work product."  Vinson,124 F.3d at 1307-1308.  The Court of Appeals

held that "under certain circumstances purely factual material embedded in attorney notes may

not deserve the super-protection afforded to a lawyer's mental impressions."  Id.  It follows that a

lawyer's testimonial recollection of unprotected, purely factual information may likewise be

discoverable.

Ultimately, the Court of Appeals found no substantial need for the attorney's notes.  The Court reasoned, the FDIC lawyer's notes indicated inconsistencies between the client's interview and his subsequent sworn testimony.  The notes of the client's lawyers "would serve only to reinforce supposed inconsistencies about which OTS already knows."  The court reasoned that corroborative evidence is generally viewed as "cumulative" rather than "necessary."  Id.

In this case, unlike the cases cited by P&C, P&C's clients are not parties to Plaintiffs' malpractice action.  Furthermore, Plaintiffs are not asking P&C to testify about its clients' communications for the purpose of using such communications against them.

Importantly, P&C omitted several relevant cases from its Motion to Quash.  Of primary relevance are several cases from the United States District Court for the District of Columbia that discuss a party's claim of work product protection in the context of oral testimony and depositions.  These cases are directly relevant and persuasive in this case.

In Cara Leslie Alexander, et al. v. FBI, et al., the court granted plaintiff's motion to compel deposition testimony after defendants refused to testify on the basis of attorney-client privilege and work product protection.  192 F.R.D. 12 (D.D.C. 2000).  Plaintiffs claimed that their privacy interests were violated when the FBI improperly handled files by handing them over to the White House.   Plaintiffs sought to depose Larry Potts, a non-party to the litigation and former Director of the Criminal Division of the FBI, because of his role in the underlying dispute in conducting investigations on behalf of President Clinton's attorneys.

Plaintiffs had previously filed a Motion to Compel Further Testimony of Larry Potts and to Impose Sanctions.  After Mr. Potts refused to testify, plaintiffs renewed their motion to compel.  President Clinton filed a motion to intervene in his personal capacity and sought to prevent Mr. Potts from answering questions that would reveal any information relating to a private investigative firm's retention that would violate the attorney-client and work-product privileges.  Plaintiffs sought to question Mr. Potts on "whether or not Potts has talked to certain

4769055.3

individuals, received any information from certain places, or received certain information in his investigations…". Id at 17.  The court held that the questions plaintiff intended to ask Mr. Potts in the deposition were relevant because they were reasonably calculated to lead to the discovery of admissible evidence and that "plaintiffs should be allowed to probe the extent of Potts' knowledge" with regard to facts relevant to the underlying dispute. Id.at 15.  Defendants and non-party Potts argued that the testimony was protected on the basis of "intangible work product." Id. at 17.

The court articulated the test for whether a claim of work product privilege is viable, and held that it was not clear that any of the anticipated questions would reveal any litigation strategy or attorney opinions. Id. at 17-18.  "The test for whether a claim of work-product privilege is viable is 'whether, in light of the nature of the [intangible work product] and the factual situation in the particular case, the [information] can fairly be said to have been prepared or obtained because of the prospect of litigation.'" Id. at 17 (citing Senate of Puerto Rico v. United States Dep't of Justice, 262 U.S. App. D.C. 166, 823 F.2d 574, 587 n. 42 (D.C. Cir. 1987)).

The Cara Leslie Alexander court found that defendants and non-party Potts failed to meet their burden of showing that the information sought by plaintiffs was protected and thereby compelled Mr. Potts to testify at the deposition because the questions asked by plaintiffs would not reveal privileged information. Id. at 19.  P&C, like non-party Potts, have simply assumed that the deposition questions would reveal privileged information rather than explaining to the court *how* answering the questions would violate its work product protection.

In Roy Banks v. Office of the Senate Sergeant-at-Arms and Doorkeeper of the United States Senate, the District Court for the District of Columbia compelled the deposition of a witness who objected to a line of questions because he claimed the answers would reveal intangible work product.  222 F.R.D. 1 (D.D.C. 2004).  The court agreed that questions posed in a deposition may be "improper if the answer would tend to disclose the lawyer's intangible work

product privilege… i.e, it would disclose counsel's mental impressions, conclusions, opinions, or legal theories." Id. at 4.  Nevertheless, the questions posed to the witness would not have breached the attorney-client privilege or work product protection, "[n]or could the answer possibly disclose any mental impressions, opinions, or strategic thinking by defendant's counsel." Id.  The court compelled the depositions of the remaining witnesses and instructed the parties that failure to comply would result in sanctions.  Id. at 6.

Other courts have decided whether deposition testimony would violate the work product doctrine by revealing the intangible work product, mental impressions, and litigation strategies of attorneys.  E.g., United States of America ex rel. Anne M. Fago v. M & T Mortgage Corp., 2006 U.S. Dist. LEXIS 61337 (D.D.C. August 30, 2006) (plaintiff sought the production of documents and testimony in a *qui tam* action that were created during an internal investigation, arguing that the underlying facts, as opposed to the attorneys' strategic decisions, were not privileged); DMS Desotech Inc v. 3D Systems Corporation, 2011 U.S. Dist. LEXIS 3292 (N.D. Ill. January 12, 2011) (holding that while Hickman and its progeny protect intangible work product, "[t]he protection of the privilege extends only to *communications* and not to facts" and thus the roles, responsibilities, and dates that an attorney was involved in litigation do "not reveal the thoughts and opinions of counsel developed in anticipation of litigation and therefore, does not constitute attorney work product") (internal citations omitted).

There is no reason to believe that Ms. Kelton's recollection of her communication with Cross will reflect her mental work product.  "Not every item which may reveal some inkling of a lawyer's mental impressions, conclusions, opinions, or legal theories is protected as opinion work product.  Were the doctrine to sweep so massively, the exception would hungrily swallow up the rule." In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1015-1016 (1st Cir. P.R. 1988)(citing Sporck v. Peil, 759 F.2d at 319 (Seitz, J., dissenting) ("every act by a litigant or his attorney gives rise to … vague inferences" as to strategy and counsel's thought processes).

15

"Whatever heightened protection may be conferred upon opinion work product, that level of protection is not triggered unless disclosure creates a real, nonspeculative danger of revealing the lawyer's thoughts." In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1015-1016 (1st Cir. P.R. 1988)(citing Gould, Inc. v. Mitsui Mining & Smelting Co., 825 F.2d 676, 680 (2d Cir. 1987); Research Institute for Medicine and Chemistry, Inc. v. Wisconsin Alumni Research Foundation, 114 F.R.D. 672, 680 (W.D. Wis. 1987)).

### 4. Applying the work product doctrine to Ms. Kelton's testimony regarding her communications with Cross does not advance the purposes of the work product doctrine under Hickman.

Under Hickman, the purposes of the work product doctrine include: "protecting an attorney's ability to formulate legal theories and prepare cases, preventing opponents from 'free-loading' off their adversaries' work, and preventing interference with ongoing litigation. 'In some instances it was also significant that the non-party was at least potentially a party or had interests that were likely to be affected by the litigation in which the work product was sought.'" Crosby v. City of New York, 269 F.R.D. 267, 278 (S.D.N.Y. 2010) (citations and footnotes omitted).  In this case, P&C's clients are not Plaintiffs' adversaries.  Plaintiffs will in no way be "free-loading" off of P&C's clients.  P&C's clients have no case to prepare.  Furthermore, as set forth below, Kelton's recollection of communications with Cross following the sharing agreement cannot be protected from Plaintiffs because such communications were intended to benefit Plaintiffs.  P&C admits in its Motion to Quash that in early 2004, Plaintiffs and P&C's clients entered into a sharing agreement, in which they agreed to pool their resources (***including the resources of their respective attorneys, P&C and C&B) … .***"  P&C Motion to Quash, 3 (Dkt 1).

There is no danger that Plaintiffs will use Ms. Kelton's testimony against P&C's clients.  This is not a situation like the one in Eirini Zagklara v. Sprague Energy Corp. cited by P&C where the non-party is one of multiple individuals liable for the plaintiff's injuries and could be

later joined as a defendant.  2011 U.S. Dist. LEXIS 56782, 6-7 (D. Me. May 26, 2011).  In

Eirini, the court was concerned with the following situation:

> Whenever multiple individuals or entities might be liable for a
> plaintiff's injury, the plaintiff could sue only one and immediately
> subpoena a report prepared for another potentially-liable party. After
> obtaining the report, the plaintiff could then amend his or her
> complaint to add that party as a defendant. That possibility is not one
> that would be countenanced by any court interpreting the work
> product doctrine or Rule 26(b)(3).
>
> Unless and until it is clearly shown that Armada (Greece) is not and
> cannot be made a party to this case, the plaintiff's argument is
> premature.

Id.

In this case, P&C's clients are not (and cannot be) liable for Plaintiffs' malpractice claims

against C&B.  There is no reasonable basis to contend that P&C's clients will be joined as

defendants in Plaintiffs' malpractice claim.  There is also no reasonable basis to contend that Ms.

Kelton's testimony of her communications with Cross will in any way harm or prejudice P&C's

clients.

### 5. Even if Kelton's Recollection of Communications with Cross Following the Sharing Agreement Are Work Product They Are Not Protected From Discovery by Plaintiffs Because of the Joint Prosecution of the GSK Lawsuits Under the Sharing Agreement.

Kelton's recollection of communications with Cross following the sharing agreement

cannot be protected from Plaintiffs because such communications were intended to benefit

Plaintiffs.  P&C admits in its Motion to Quash that in early 2004, Plaintiffs and P&C's clients

entered into a sharing agreement, in which they agreed to pool their resources (***including the

resources of their respective attorneys, P&C and C&B) … .***"  P&C Motion to Quash, 3 (Dkt 1).

According to P&C, *in reliance upon that agreement*, P&C worked cooperatively with Thorpe

and Hamrick's counsel [i.e., C&B] to maximize the recovery by the government (to the benefit

of all plaintiffs).  Id. at p. 4.  Accordingly, to the extent that, Ms. Kelton's communications with

Cross were work product they were joint and were intended to advance both Plaintiffs' and P&C's collective efforts in litigating the GSK Lawsuits. *P&C and Ms. Kelton were Plaintiffs shared "resource." As Plaintiffs' shared "resource," Plaintiffs are entitled to depose Ms. Kelton as to her communication with Cross. P&C and Ms. Kelton waived any claim of work product of her recollections of such communications when P&C's clients entered into the sharing agreement with Plaintiffs, in which they agreed to pool their resources (**including the resources of their respective attorneys, P&C and C&B**) … ."*

Plaintiffs would be prejudiced if they were not able to question Ms. Kelton as to her communications with Cross relating to her work on behalf of all of the relators, including Plaintiffs.   For example, Ms. Kelton, on behalf of her clients and Plaintiffs communicated with the government regarding the entry of the Protective Order and P&C's and Plaintiffs' efforts to data mine the government's investigatory file.   In their Malpractice claim, Plaintiffs allege that Cross falsely told Plaintiffs that the Protective Order allowed only attorneys to data-mine the government's database.   Complaint, ¶¶ 143-149.   Recently, in response to an ethics investigation in Colorado, Keith Cross has suggested that his original understanding of the Protective Order was based upon statements made by Ms. Kelton regarding the terms of the Protective Order and the government's plan for data mining.   Plaintiffs should be entitled to question Ms. Kelton as to her statements made to Cross relating to the Protective Order, as any such statements were done for the collective benefit of Plaintiffs and P&C's clients.

### 6. Plaintiffs have a substantial need for Ms. Kelton's deposition.

Plaintiffs have a substantial need for Ms. Kelton's deposition.   While Cross is of course available to testify as to his communications with Ms. Kelton, he is <u>not</u> a disinterested witness.   Moreover, he has lied to his clients in the past to protect his own interests and failed to produce documents.   For example, P&C previously claimed that it had not received a copy of the protective order entered in the GSK Lawsuits.   When Cross first turned over a copy of his file to

replacement counsel, he represented to replacement counsel and to Plaintiffs' counsel that such copy was a complete copy of his file.  That turned out to be false.  In Cross's recent response to the Colorado Disciplinary Board's investigation, Cross attached to that response a copy of the March 28, 2008 protective order issued by Judge Gertner, as well as an October 6, 2008 letter from U.S. Attorney, Sara Bloom, enclosing the protective order.  Neither document was included in Cross's previously produced file, even though they naturally belong in the file.[2]  This is the same protective order that Cross falsely told his clients allowed only attorneys to data-mine the government's database.  Complaint, ¶¶ 143-149.  Accordingly, Plaintiffs have a substantial need for Ms. Kelton's testimony as to her communications with Cross.

### 7.  P&C  is not entitled to the heightened protection afforded opposing counsel under <u>Shelton</u>.

In its Motion to Quash, P&C argues that Ms. Kelton is entitled to the heightened protection afforded opposing counsel by the Eighth Circuit's decision in <u>Shelton v. Am. Motors Corp.</u>, 805 F.2d 1323, 1327 (8th Cir. 1986) (holding that plaintiffs in vehicle rollover case were not allowed to take opposing counsel's deposition where questions would cause attorney to divulge work product).  <u>Shelton</u> held that while opposing trial counsel are not "absolutely immune from being deposed," courts should be more sensitive to allowing depositions of *opposing counsel* because of the possibility that such depositions might disrupt the adversarial process or infringe on the attorney-client privilege or attorney work product. 805 F.2d at 1327. To protect against this danger, <u>Shelton</u> shifts the burden onto the party seeking to take the opposing counsel's deposition to show that "(1) no other means exists to obtain the information than to depose opposing counsel. . . . (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." <u>Id</u>. at 1327.

---

[2] <u>See</u> <u>In Re Third Party Subpoena for Documents</u>, NO.  1:13-mc-00405-JEB-DAR, District Court for the District of Columbia, Dkt. 11, Exhibit "C" (Seidman Declaration).

*Shelton's* heightened standard is inapplicable to this case, however, because Ms. Kelton is *not opposing counsel, and her clients are not parties to Plaintiffs' malpractice action*.  P&C has failed to cite a single case that applies the Shelton test where a party seeks to depose the counsel of a non-party witness. Courts in the Second and Ninth Circuit have expressly rejected the application of the Shelton test in cases where non-party attorneys have been served with deposition subpoenas. See In re Subpoena Issued to Friedman, 350 F.3d 65, 72 (2d Cir. 2003) (district court improperly subjected the proposed deposition of a non-party attorney "to the Shelton test, rather than to the flexible approach that we conclude is mandated by the federal rules"); In re Interactive Network, Inc., 243 B.R. 766, 767-68 (Bankr. N.D. Cal. 2000) (declining to follow Shelton and adopting "the liberal approach to discovery directed at attorneys"). Instead, these courts have adopted the standard set forth in Rule 26, which "require[s] a flexible approach to lawyer depositions whereby the judicial officer supervising discovery takes into consideration all of the relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship." Friedman, 350 F.3d at 72.

None of the policy concerns at issue in Shelton are present here.  The primary harm that Shelton was designed to deter was litigants' use of the discovery process to obtain the work product or trial strategy of their adversaries. Shelton, 805 F. 2d at 1329 (noting that permitting deposition of opposing counsel about the documents she had reviewed could reveal opponent's trial strategy); see also Hickman v. Taylor, 329 U.S. 495, 516 (1947) (Jackson, J., concurring) (noting that practice of forcing opposing counsel to testify was disfavored because "[d]iscovery was hardly intended to enable a learned profession to perform its functions . . . on wits borrowed from the adversary").  Here, by contrast, Ms. Kelton's clients are not parties to Plaintiffs' malpractice action, so none of the information Plaintiffs seeks could intrude on her trial strategy, especially considering that P&C's clients' lawsuit has concluded and that, pursuant to the sharing

20

agreement, Ms. Kelton's communications with Cross were for the benefit of all relators,

including Plaintiffs.

> **8.   Even if <u>Shelton</u> applied, Plaintiffs easily satisfy Shelton's three part test.**

Even if the <u>Shelton</u> test applied, Plaintiffs would still have good cause to depose Ms.

Kelton.  Under <u>Shelton</u>, a party seeking to depose opposing counsel must show that (1) the

information sought is relevant and non-privileged; (2) the information is crucial to the

preparation of the case; and (3) no other means exist to obtain the information than to depose

opposing counsel.  <u>Shelton</u>, 805 F.2d at 1327.  Plaintiffs easily satisfy all three of these tests.

> **(a)   The information Plaintiffs seek is relevant.**

Rule 401 of the Federal Rules of Evidence provides that "'[r]elevant evidence' means any

evidence having any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the

evidence." Fed. R. Evid. 401.  Here, it is beyond dispute that the evidence sought by Plaintiffs is

relevant.

Ms. Kelton was lead counsel for P&C's representation of its relator clients for their *qui*

*tam* lawsuit against GSK.  Ms. Kelton worked with Mr. Cross for over six (6) years until

Plaintiffs replaced C&B with new counsel.  Among other things, Cross negotiated with Ms.

Kelton the sharing agreement between her clients and Plaintiffs.  Plaintiffs allege, among other

things, that Cross did not follow their instructions in negotiating the sharing agreement.  Ms.

Kelton is a fact witness to Cross's negotiation of the sharing agreement.  She is, in fact, the only

witness besides Cross himself and is the only disinterested witness.  Ms. Kelton is also a fact

witness to other conversations with Cross in which Plaintiffs allege that Cross failed to follow

his clients' instructions, or failed to take the most favorable position for his clients vis-à-vis Ms.

Kelton's clients.  As a shared "resource" under the sharing agreement, Kelton is also a fact

witness as to her efforts to advance both Plaintiffs' and P&C's collective efforts in litigating the

GSK Lawsuits

### (b) The Information Plaintiffs Seek is Not Protected by the Work Product Doctrine.

As set forth above, there is no basis to apply the work product doctrine to Ms. Kelton's

testimony of here communications with Cross.  Even if such testimony is work product,

Plaintiffs have demonstrated sufficient substantial need.

### (c) The Information Plaintiffs Seek is Crucial to Their Malpractice Lawsuit

Plaintiffs meet the last prong of the <u>Shelton</u> test because Cross has in the past lied to

Plaintiffs about his conduct that is at issue in this case.

### 9. Plaintiffs' Subpoena does not impose an undue burden on P&C or Ms. Kelton.

P&C claim that Plaintiffs' Subpoena imposes an undue burden on P&C and Ms. Kelton is

also unfounded.  Under Rule 45, "[t]he issue is not whether compliance creates a burden but

rather whether that burden is unduly.  The issue of undue burden 'is, of course, a matter to be

decided in the light of the circumstances of the case … .'"  <u>First Am. Corp. v. Sheik Zayed Bin</u>

<u>Sultan Al-Nahyan</u>, 1996 U.S. Dist. LEXIS 4577, 12-13 (D.D.C. 1996)(quoting <u>Northrop Corp. v.</u>

<u>McDonnell Douglas Corp.</u>, 751 F.2d 395, 403 (D.C. Cir. 1984)).  "To evaluate the burden, the

Court must consider 'the needs of the case, the amount in controversy, the parties' resources, the

importance of the issues at stake in the action, and the importance of discovery in resolving the

issues.'" <u>Id</u>. (quoting Fed. R. Civ. P. 26(b)(2)(C)(iii)).  Here, Plaintiffs' need to depose Ms.

Kelton greatly outweighs the minimal burden imposed on Ms. Kelton by having to appear for a

deposition and answer questions.

As set forth above, Plaintiffs' Subpoena seeks information relevant to their malpractice

Complaint or the defenses raised in the counterclaim for a fee.

The amount in controversy is quite large.  The Massachusetts District Court is currently holding C&B's disputed contingency-fee award in the approximate amount of $30 million dollars pending the resolution of Plaintiffs' legal malpractice claim and C&B's fee dispute.

The issues at stake are not only important for both Plaintiffs and C&B, but also for protecting the integrity of the legal profession.

P&C has the resources to present Ms. Kelton for deposition.  It need not hire counsel (it is representing itself) and received a contingency-fee award plus statutory fees that likely exceed $30 million dollars.  According to its website, P&C "is the nation's most successful and most experienced law firm representing whistleblowers."   It claims that "[w]histleblower cases brought by Phillips & Cohen attorneys have recovered more than $11 billion in civil and related criminal settlements for government entities - a record of success that far exceeds any other law firm." P&C website, http://www.phillipsandcohen.com/About-the-Firm.shtml (visited on May 24, 2013).

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request this Honorable Court deny P&C's Motion to Quash as provided in the attached form of Order.

Respectfully submitted,

**OBERMAYER REBMANN
MAXWELL & HIPPEL LLP**

_____/s/_____
Joseph J. McGovern, Esquire
(D.C. Bar No. 936609)
H. David Seidman, Esquire
(Pro Hac Vice Pending)
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103
Telephone:  (215) 665-3000
Fax:  (215) 665-3165

*Attorney for Plaintiffs
Gregory Thorpe and Blair Hamrick*

Date: December 20, 2013

4769055.3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IN RE THIRD-PARTY SUBPOENA TO PRODUCE DOCUMENTS | |
| | NO.  1:13-mc-00405-JEB-DAR |
| GREGORY THORPE, *et al.* | |
| Plaintiffs | |
| vs. | NO.  1:12-cv-11632-RWZ Pending in District of Massachusetts |
| KEITH F. CROSS, *et al.* | |
| Defendants | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies and states that a true and correct copy of the attached

Response has been served via ECF upon the following:

> Peter Wilson Chatfield, Esquire
> PHILLIPS & COHEN LLP
> 2000 Massachusetts Avenue, NW
> Washington, DC 20036
>
> Stephen Hasegawa, Esquire
> PHILLIPS & COHEN LLP
> 100 The Embarcadero, Suite 300
> San Francisco, CA 94105


        /s/
_____
H. David Seidman, Esquire

*Attorney for Plaintiffs*
*Gregory Thorpe and Blair Hamrick*

Dated:  December 20, 2013

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE THIRD-PARTY SUBPOENA TO PRODUCE DOCUMENTS | |
| | NO.  1:13-mc-00405-JEB-DAR |
| GREGORY THORPE, *et al*. | |
| Plaintiffs | |
| vs. | NO.  1:12-cv-11632-RWZ |
| | Pending in District of Massachusetts |
| KEITH F. CROSS, *et al*. | |
| Defendants | |

## <u>ORDER</u>

**AND NOW**, this ____ day of _____, 2013, upon consideration of the Motion to Quash or, in the Alternative, for Protective Order Re: Subpoena for Deposition filed by Phillips and Cohen, LLP (the "Motion"), and any response thereto, it is hereby **ORDERED** that the Motion is **DENIED.**

**BY THE COURT:**

_____
                                                              J.

4769055.3